# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CA-01576-SCT

*MICHAEL A. HUSETH*

*v.*

*TAVIA M. HUSETH*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/14/2012 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| TRIAL COURT ATTORNEYS: | MARK. A CHINN |
| | WILLIAM R. WRIGHT |
| COURT FROM WHICH APPEALED: | CHANCERY COURT OF THE FIRST |
| | JUDICIAL DISTRICT OF HINDS COUNTY |
| ATTORNEYS FOR APPELLANT: | MARK A. CHINN |
| | MATTHEW THOMPSON |
| ATTORNEYS FOR APPELLEE: | AMANDA JANE PROCTOR |
| | WILLIAM R. WRIGHT |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART |
| | AND REMANDED - 04/10/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., KITCHENS AND COLEMAN, JJ.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     Michael Huseth (Mike) appeals the judgment of the Chancery Court of the First Judicial District of Hinds County which granted his wife Tavia Huseth (Tavia) an award of separate maintenance, full physical custody of their son, and attorney fees. Tavia has requested attorney fees on appeal equal to half of the fees she was awarded at trial. We affirm the chancellor's judgment in part, reverse it in part and remand the case to the chancery court, and we deny Tavia's request for attorney fees on appeal.

## FACTS AND PROCEDURAL HISTORY

¶2.    Mike and Tavia have been married since 1998. They have one child together, who was born April 9, 1999. The couple separated in October 2011. Mike claims that the couple's stormy relationship ended "when Tavia punched Mike in the side" and told him to pack his bags and get out. Mike claims that he had a number of pictures on his phone from previous instances of Tavia's hitting him, which Tavia had found and erased. On the night in question, Mike took a picture of a bruise he claims to have suffered when Tavia "sucker punched" him in the kidney. According to him, when Mike said to Tavia that she could not delete the picture, she told him to pack his bags and "get the hell out of there." At that point, Mike left. He claims that, after their separation, Tavia prevented him from seeing his son, at one point forcing him to leave the school the son attends and telling Mike that he shouldn't be there.

¶3.    Tavia's version of events, which generally was not disputed by Mike, provides a more expansive story. In October 2011, the couple went to San Diego to see Mike's son from a previous marriage as he returned home from Afghanistan. When they returned to Jackson, Mike left home and told Tavia he needed to "cool off for no more than two weeks" and get some marital therapy. Mike returned on October 27, 2011, and met Tavia for lunch. According to Tavia, when she sat down, Mike handed her his divorce attorney's business card and told her, "It's over." They continued discussing the matter in the driveway of their home, and Mike kept repeating to Tavia that the marriage was over. Later that evening, Mike returned and told Tavia that he was going to come home and live with her again. That night, the two had sexual relations. The next day, Mike took their son to school and did not return. When Tavia asked him what was going on, Mike again told her that it was over.

¶4. The next month, Mike filed a petition for divorce based upon irreconcilable differences. He continued to pay the household bills through January 2012. Tavia claims that she did not want a divorce, and after two postponed mediations, Mike dismissed the complaint for divorce and filed a petition seeking sole legal and physical custody of the couple's son. He did not ask for joint custody. Tavia filed a countercomplaint, seeking separate maintenance and custody. Prior to this separation, Mike had paid most of the household bills, but he admitted that his parents had loaned him the money to pay almost all of these amounts. Tavia alleged that she did not in any way cause Mike to leave the marital home and relationship, that she depended upon Mike to support and maintain herself and their child, and that she was therefore entitled to separate maintenance until Mike returned home. She also asked for physical custody of their son and attorney fees. Mike argued that she was completely at fault for his departure from the home, and that she specifically had asked for him to leave with no intention of reconciling.

¶5. The chancellor held a hearing on both parties' pleadings on August 8 and 9, 2012. Extensive testimony was elicited regarding Mike's income, work history, and earning potential. Over the course of the marriage, Mike held several different jobs. Mike has a degree in economics, a master's degree in public administration, and a master's degree in Biblical studies. He currently is the president of Lakin Enterprises, a company owned by his mother and stepfather. At the time of trial in August 2012, that company owned one rental property. Mike's duties as president include "communicating with the attorneys . . . we have and then also the CPA, and the accountant and then with the folks that lease our building over on Highway 18." When asked whether usually there was a day in the week when he had

anything to do with Lakin Enterprises, he replied, "There is not a whole lot, no. I mean I have to balance the accounts and I check the balance every day." For this job, Mike is paid $3,709.06 per month. From 2006 to 2010, Mike also worked at the Lutheran Episcopal Services Agency ("LES"). When he was terminated in 2010, Mike was being paid $114,000 a year by LES. Since losing that job, Mike's only source of income has been from Lakin Enterprises. Tavia is a social worker at Baptist Medical Center. She is paid approximately $5,122.16 per month after taxes.

¶6.    Mike and Tavia gave testimony regarding their respective fitness to have custody of their son, each person's relative earning capacity and present income, and the reasons for their separation. Mike and Tavia were cross examined thoroughly. At the hearing, Mike testified that he really wanted joint custody of their child, but had filed for sole custody on the advice of his attorney. Tavia and Mike agreed that Mike was a good father, and Tavia said she was seeking joint legal and sole physical custody of their son, with provisions for reasonable visitation for Mike. Beyond testifying about his income, Mike elaborated concerning the money he had borrowed from his parents to pay his bills, as well as the more than $200,000 house his parents had purchased for him so his son could have a good environment while visiting his father. He testified that, after the separation, Tavia would not allow him in the marital home, she had dumped all of his clothes in the driveway, and she would not permit him to retrieve his personal effects, including his bicycle. Tavia testified that she verbally had asked Mike several times to come home and he had refused. She testified that, if he asked to come home that night, she would let him.

¶7. The chancellor found that Tavia's fault in causing the separation was not equal to or greater than Mike's and awarded her separate maintenance in the amount of $3,000 per month and child support in the amount of $988 per month. The chancellor ordered Mike to bring the mortgage current and instructed Tavia to pay the $2,248 per month mortgage out of the $3,000 monthly separate maintenance payment, leaving $752 per month in additional support. To determine the amounts of these awards, the chancellor looked beyond Mike's income from Lakin Enterprises and included the regular loans he received from his parents as well as his earning capacity to impute to him an income of $7,058 per month. The chancellor granted full physical custody of their son to Tavia and set up a visitation schedule for Mike. The chancellor also awarded attorney fees of $25,000 to Tavia, based upon her attorney's billing sheet and testimony regarding the representation. Mike timely perfected his appeal.

**TAVIA HUSETH'S MOTION TO STRIKE**
**MIKE HUSETH'S SUPPLEMENTAL BRIEF**

¶8. On October 1, 2013, Mike filed a supplemental brief to inform this Court of the recent decision of the Court of Appeals in ***Houston v. Houston***, 121 So. 3d 283 (Miss. Ct. App. 2013). The case involved imputation of income based upon parental financial assistance. On October 7, 2013, Tavia filed a motion to strike the supplemental brief from the record. Tavia argues that citation to supplemental authority should be made only through a letter to the Court pursuant to Mississippi Rule of Appellate Procedure 28(k).[1] She also notes that

---

[1]"When pertinent . . . authorities come to the attention of counsel after the party's brief has been filed, . . . the party may promptly advise the clerk of the Supreme Court, by letter with a copy to all counsel, setting forth the citations." M.R.A.P. 28(k).

Mississippi Rule of Appellate Procedure 28(d) states that, after the appellant has filed a reply brief, "[n]o further briefs may be filed except with leave of the Court." M.R.A.P. 28(d). Tavia also has filed with this Court a letter notifying the Court of the *Houston* decision, in compliance with Rule 28(k).

¶9.     Tavia is correct. Mike filed his supplemental brief in violation of Rule 28(d) and failed to comply with the procedures of supplemental citation provided by Rule 28(k). Further, Tavia has complied with those rules and has made the Court aware of the supplemental authority at issue. We therefore grant Tavia's motion to strike Mike's supplemental brief.

## STANDARD OF REVIEW

¶10.    Decisions to allow separate maintenance and amounts awarded are "matters within the discretion of the chancellor. Further, these decisions will not be reversed unless they are against the overwhelming weight of the evidence." *Honts v. Honts*, 690 So. 2d 1151, 1153 (Miss. 1997). "On appeal, this Court will not overturn the chancery court unless its findings were manifestly wrong." *Daigle v. Daigle*, 626 So. 2d 140, 144 (Miss. 1993).

## ANALYSIS

¶11.    On appeal, Mike raises the following issues:

I.      The chancellor erred in awarding separate maintenance.

II.     The chancellor erred in imputing income to Mike and awarding separate maintenance in the amount of $3,000 per month.

III.    The chancellor erred in awarding child support as a percentage of gross income instead of adjusted gross income and failed to properly calculate the taxes on such incorrect and imputed income for both support and maintenance.

6

IV.   The chancellor erred in failing to award Mike joint custody, or at least more than standard time of visitation with his son.

V.   The chancellor erred in awarding attorney fees and in awarding them in the amount of $25,000.

¶12.   Tavia disputes all of this and further argues that she should be awarded attorney fees on appeal of one-half the amount awarded at trial, or $12,500.

**I.   Whether the chancellor erred in awarding separate maintenance.**

¶13.   "Separate maintenance is 'a court-created equitable relief' based upon the marriage relationship." *Lynch v. Lynch*, 616 So. 2d 294, 296 (Miss. 1993) (quoting *Robinson v. Robinson*, 554 So. 2d 300, 303 (Miss. 1989)). It is a command from the court that the married couple resume cohabitation, and, failing that, the party at fault for the separation must provide suitable maintenance to his or her spouse until they are reconciled. *Lynch*, 616 So. 2d at 296.

> While the law does not require a wife who leaves her husband to be blameless, misconduct on her part which materially contributes to the separation, so that it may be said that the fault of the wife is equal to or greater than that of the husband, or that his fault was not sufficient to justify her leaving the domicile, is a defense to her suit for separate maintenance.

*Robinson v. Robinson*, 554 So. 2d 300, 304 (Miss. 1989) (quoting *King v. King*, 246 Miss. 798, 801, 152 So. 2d 889, 891 (1963)). In other words, the chancellor may grant separate maintenance if the wife can show separation without fault on her part combined with wilful abandonment by the husband and the husband's refusal to support her. *Lynch*, 616 So. 2d at 296.

¶14.   Mike argues that the evidence shows that Tavia requested the separation, and therefore, she is completely at fault for the separation. Tavia did testify that, one night, when

7

Mike was taking a photograph of a bruise from a punch he said was administered by Tavia, she told him something along the line of, "if you are just going to sit around the house and take silly pictures like this then leave." He also argues that she would not let him back into the home to recover his possessions, see his son, or otherwise show any indication that she wanted to resume cohabitation. He also emphasizes that, one day, Tavia told their lawn man to "tell Mike to kiss my ass." Mike argues that Tavia's complaints about his behavior, whether it be his drinking, affinity for pornography, or general unemployment, show that she does not want him to come back. Overall, Mike argues that the fault of the separation lies almost entirely with Tavia, or that she is at least as much at fault as he.

¶15.    Tavia responds that Mike unequivocally abandoned the home. He left for two weeks, and when he returned, he handed her a divorce attorney's business card and told her it was over. Mike did not dispute this. He repeated to her that it was over during the course of several hours, as the two discussed it. That night, they engaged in sexual relations; but the next morning, he left for good and again told her that it was over. She further explained that her "kiss my ass" comment was in response to the lawn man's telling her that she had to pay him for mowing the lawn, even though Mike had told him to mow it. We conclude that Mike failed to prove any specific behavior on the part of Tavia that prompted his leaving the house. Instead, the evidence shows that Mike wanted to leave, and he left. Additionally, Tavia testified that she had asked Mike to return several times, and that if he were to ask to return that night, she would say yes. However, he did not ask to return that night.

¶16.    Mike also argues that the chancellor applied the wrong legal standard in granting the award. The chancellor, in announcing her ruling, stated that "there must be some evidence

8

of treatment that would rise to the level of cruelty" on the part of the wife to justify a denial of separate maintenance. Mike is correct that this is not the appropriate standard. Instead, the wife must not be at fault at a level equal to or greater than the husband, and the husband must have abandoned the home and refused support. *See Lynch*, 616 So. 2d at 296. But, ultimately, the chancellor did not use the wrong standard. In announcing her opinion, the chancellor cited *Robinson* for the proposition that the court must deny separate maintenance "where the fault of the wife is equal to or greater than that of the husband." The chancellor then looked to the conduct of the parties and found that "Mr. Huseth left the marriage with the direction that the marriage was over." The chancellor found that the situation was one of incompatibility, looked at all of the facts presented, and determined that Tavia's fault was not equal to or greater than Mike's.

¶17.    Both parties presented extensive testimony and evidence regarding the cause of the separation. The chancellor applied the correct legal standard to determine whether Tavia, as the petitioner for separate maintenance, had materially contributed to the separation to the point that she was at least as much at fault as was Mike. The chancellor did not find that she was. "The credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation, are primarily for the chancellor as the trier of facts." *Rainey v. Rainey*, 205 So. 2d 514, 515 (Miss. 1967). This decision was not against the overwhelming weight of the evidence, nor was it manifestly wrong. The chancellor's award of separate maintenance is affirmed.

**II.    Whether the chancellor erred in imputing income to Mike and awarding separate maintenance in the amount of $3,000 per month**.

9

¶18.    Mike argues that the chancellor erred in granting Tavia separate maintenance in the amount of $3,000 per month when the record showed that Mike earns only about $3,700 per month before taxes. When the separate maintenance is combined with the $988 per month that Mike must pay in child support, Mike argues that he is responsible for paying more money per month than he earns. He argues that the chancellor erred by imputing income to him based on gifts and loans from his parents as well as his earning potential.

¶19.    This Court has held that the amount of a separate maintenance award should be enough "to provide, as nearly as possible, the same sort of normal support for the wife, all things considered, as she would have received in the home, if the parties had continued normal cohabitation." *Thompson v. Thompson*, 527 So. 2d 617, 622 (Miss. 1988). "However, the allowance should not unduly deplete the husband's estate." *Id.* When making an award of separate maintenance, a court must consider:

(1)    The health of both husband and wife;

(2)    Their combined earning capacity;

(3)    The reasonable needs of the wife and children;

(4)    The necessary living expenses of the husband;

(5)    The fact that the wife has free use of the home and furnishings; and

(6)    Other such facts and circumstances bearing on the subject that might be shown by the evidence.

*Robinson*, 554 So. 2d at 305 (citing *Gray v. Gray*, 484 So. 2d 1032, 1033 (Miss. 1986); *Tanner v. Tanner*, 481 So. 2d 1063, 1065 (Miss. 1985)).

10

¶20. Mike testified that his only source of income is his paycheck from Lakin Enterprises of $3,709.06 per month. After taxes, he nets $2,520.47 per month. When he was fired from his previous job at LES in 2010, he was earning $114,000 per year from that source. Since then, he says he has been searching for work ceaselessly but has been unable to find anything. Mike testified that he currently is living in a house that was purchased by his mother and stepfather for which he pays no rent. He often gets by on loans from his parents. He testified that he probably owes his parents around $300,000. He also has a debit card for Lakin Enterprises with which he may make purchases beyond his salary if he gets approval from his parents. Tavia submitted that she earns $5,122.16 per month after taxes. She also submitted a list of monthly expenses paid by Mike, the largest of which is a $2,248 mortgage payment.

¶21. It is undisputed that Mike's parents provided substantial financial assistance to him after he was discharged by LES. When he still was living with Tavia, his monthly expenses exceeded his monthly income, but he was able to meet them through loans from his parents. The chancellor noted that Mike's parents purchased a home for him worth $275,000, for which he pays no rent. She noted that Lakin Enterprises pays for his car, car insurance, and telephone and internet bills. She found that "it's clear that [Mike's parents] stepped into the role of helping to provide for the expenses. . . ." The chancellor considered this, along with Mike's earnings at LES, as a baseline for his earning potential and imputed an adjusted gross income to Mike of $7,058 per month. She awarded fourteen percent of that, or $988, as child support. The chancellor found that a separate maintenance award of $3,000 was equitable, which was to be used by Tavia to pay her monthly expenses.

11

¶22. Mike argues that the chancellor erred in imputing to him a salary based upon loans from his parents and an earning capacity related to a salary he had been unable to attain in the two years prior to trial. Tavia argues that the chancellor did not base the award on money from his parents, but rather based it upon the expenses paid for Mike by Lakin Enterprises. The chancellor found that Mike pays no rent, no car payment, no car insurance payment, no telephone bill, and no internet bill. He has a debit card from Lakin Enterprises that he may use with his parents' permission. Tavia argues that the monthly combined estimated value of the items and services that Mike's parents are paying for is $4,497.15. According to her, if that value is added to his actual salary of $3,709.06 per month, then it was reasonable for the chancellor to impute an income of $7,058 to Mike.

¶23. The Court of Appeals recently decided a case in which gifts from parents were imputed to the salary of a spouse forced to pay alimony. In *Houston v. Houston*, 121 So. 3d 283 (Miss. 2013), the Court of Appeals affirmed the chancellor's decision to compute the wife's income partially based upon regular gifts from her wealthy parents. There, the chancellor found that the wife's income was "$3,000 per month based on the average value of the amount of money her parents gave her each month." *Id.* at 292. The wife cited the decision in *Robinson*, 554 So. 2d at 305, in which this Court held that it was improper to consider gratuities to the payee of separate maintenance in determining the amount of maintenance for which the payor was responsible. The wife argued that, in her case, the court should not consider gratuities given to her by her parents in determining her income. *Houston*, 121 So. 3d at 292. In *Houston*, it was clear that the wife's parents consistently had provided her an allowance of between $2,000 and $4,000 per month throughout her marriage.

12

*Id.* The Court of Appeals rejected that argument, stating that the chancellor was not penalizing the wife for the gifts given by her parents. *Id.* "Instead, the chancellor merely accepted the reality of the unique circumstances–Kellye's parents consistently paid for practically all of Kellye's expenses and regularly supplemented her income." *Id.*

¶24. We are faced with a problem in this case, because the chancellor never outlined the amounts of the separate living expenses, paid for by Lakin Enterprises for Mike, upon which the imputed income amount was based. We are able to look only at the lump sum amount of the imputed income, without any consideration of the expenses that imputed income went to pay. There are other reasons that the award may have been proper. For example, the evidence admitted at trial showed that Mike's monthly expenses, when he was living with Tavia after being laid off, were $5,741.01. When confronted with those expenses, Mike said, "That looks about right." Those expenses included the monthly mortgage payment of $2,248. Tavia is now responsible for paying the monthly house note out of the $3,000 separate maintenance payment from Mike. This leaves her with an additional $752 per month in support through separate maintenance.

¶25. In reaching her decision, the chancellor listed all of the payments made for Mike by his parents and Lakin Enterprises. She listed the house that was purchased for him, his automobile payments, and his "expenses related to telephone or technology expenses." She continued:

> And the Court does impute those payments to his income. And after the Court imputes those payments, the income is between $6,500 and $7,000 per month, a benefit that he receives. And his prior salary over the years has ranged from $90,000 approximately. I believe . . . that last job was $110,000.

13

So based upon his prior, his abilities, his earning capacity, the Court finds that it's reasonable to impute the income to an amount of $7,058.

. . .

Now, with regard to separate maintenance, it is correct that Mrs. Huseth does make more money if you look at actual income. But, of course, if you look at the computing, imputing of the income then he does make more money.

. . .

So even if you look at the figure that the Court has imputed, even a 50 percent award would be equitable. And that amount is $3,000, which would have to be used for the payment of the expenses, which is listed on the exhibit, monthly expenses paid by Mike Huseth.

And I know in the past I had divided it up into payment for specific expenses. But this will be a lump sum amount.

¶26.   The difference between this situation and that in *Houston* is that the cash gifts to the wife in *Houston* were easily identifiable and went directly into the wife's pocket. Here, the gifts given to Mike were payment of his living expenses, including rent, automobile payments, insurance premiums, cable and internet charges, and cell phone charges. By imputing those payments as income to Mike, without offsetting the income with the legitimate expenses paid by that income, the chancellor assumed Mike had the money available to pay separate maintenance. In effect, the chancellor determined that, hypothetically, if Mike had been paying for all of the expenses provided to him by Lakin Enterprises, and he had $3,709.56 per month left over (his actual wages from his only current job), then it would be as if he received a salary of $7,058 per month. The difficulty is that, if Mike's income was $7,058 per month, but he was spending $3,349 per month on his living expenses, he would have only $3,709 left from which to pay child support and separate

14

maintenance. Viewed this way, the award of $3,988 per month in separate maintenance and child support payments is erroneous, as it requires Mike to pay more money per month than he actually has. Further, because Mike nets only $2,520.47 per month after taxes, he is being ordered to pay nearly $1,500 more per month than he has available. The amount that Mike was ordered to pay for separate maintenance was calculated without appropriate regard for "[t]he necessary living expenses of the husband." ***Robinson***, 554 So. 2d at 305.

¶27.    This is a difficult and unique case. Mike's living expenses are paid entirely by his parents and/or Lakin Enterprises. In addition to that, he receives a salary from Lakin Enterprises. When living with Tavia, he somehow managed to pay more than $5,000 dollars per month in bills while netting only $2,520.47 per month in salary. This was accomplished through assistance from his parents. Now that he has moved into the house his parents purchased for him, he receives the same amount of cash, his living expenses are covered by his parents, and he contends that $3,988 per month in separate maintenance and child support is too much. Mike works minimal hours, and two years ago, he received more than $100,000 per year in wages. These circumstances are compelling in imputing additional income to Mike. However, if imputed income is applied to Mike's actual living expenses, those expenses offset the imputed income and must be taken into account when determining the amount of separate maintenance which Mike must pay.

¶28.    Mike is on the hook for more money than he has the ability to pay at present. While the imputation of income may have been correct, the amount of separate maintenance awarded was improperly based on the chancellor's incorrect belief that the money was available to Mike for separate maintenance payments. Further, we are left to guess how much

of the imputed income was due to Mike's earning potential, especially in light of the fact that the chancellor's determination of earning potential was seemingly based upon a salary that Mike had not received for two years. We require more detail in such judgments so that we may properly determine if the chancery court has abused its discretion. Accordingly, we reverse the chancellor's determination of imputed income and award of separate maintenance, and remand the case to the chancery court for a more detailed and more accurate finding to support the amount of imputed income available for separate maintenance, and for a determination of whether an award of separate maintenance is appropriate, and that, if so, takes into account Mike's reasonable living expenses.

### III. The chancellor erred in awarding child support as a percentage of gross income instead of adjusted gross income. The chancellor failed to make specific findings of fact regarding the support and maintenance determination.

¶29. Mike argues that the chancellor erred in awarding child support based upon fourteen percent of his gross monthly income, rather than his adjusted gross monthly income. He argues that this is clear because the chancellor did not include a tax analysis in her determination. He also argues that it is unclear how the chancellor reached her determination of his imputed income, and that the chancellor should have included specific findings.

¶30. The chancellor granted child support in the amount of $988, as that is fourteen percent of the income of $7,058 the chancellor imputed to Mike. The chancellor's judgment specifically stated that $7,058 per month was Mike's imputed "adjusted gross income." In accordance with the foregoing discussion regarding imputed income and separate maintenance, this Court requires a more detailed finding by the chancellor regarding the

numbers used to support her award of imputed income. Accordingly, we reverse the chancellor's award of child support and remand for a computation supported by her detailed computation of Mike's imputed income. Additionally, the chancellor's computation of child support based upon a percentage of Mike's imputed income, using only the statutory guidelines, did not properly reflect Mike's ability to pay the child support. In awarding child support, the chancellor should consider

1. The health of the husband and his earning capacity.

2. The health of the wife and her earning capacity;

3. The entire sources of income for both parties;

4. The reasonable needs of the wife;

5. The reasonable needs of the child;

6. *The necessary living expenses of the husband*;

7. The estimated amount of income taxes the respective parties must pay on their incomes;

8. The fact that the wife has the free use of the home, furnishings, and automobile, and

9. Such other facts and circumstances bearing on the subject that might be shown by the evidence.

*Gillespie v. Gillespie*, 594 So. 2d 620, 622 (Miss. 1992) (emphasis added) (citing *Brabham v. Brabham*, 226 Miss. 165, 176, 84 So. 2d 147, 153 (1955)).

¶31. "When entering a child support decree, the chancellor should consider *all* circumstances relevant to the needs of the children *and the capacities of the parents*." *Tedford v. Dempsey*, 437 So. 2d 410, 422 (Miss. 1983) (second emphasis added). Here, the

17

chancellor imputed the living expenses of Mike as income, without offsetting those same expenses in her determination of the money Mike had available to pay child support. She did not consider the necessary living expenses of the husband in computing the amount of child support. Additionally, as noted previously, she failed to outline how much of Mike's imputed income was based upon his earning potential, and upon what his earning potential was based. Therefore, we reverse the chancellor's child support award and remand for a determination of child support in which all of the facts and circumstances, including what Mike actually can pay, are taken into account.

**IV. Whether the chancellor erred in failing to award Mike joint custody, or at least more than standard time of visitation with his son.**

¶32. Mike argues that the chancellor failed to conduct a full *Albright* analysis before making her custody determination, and her determination therefore should be reversed. *See Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). Tavia counters that it was clear that the chancellor considered the factors, even though she may not have given a detailed account of her findings.

¶33. This area of the law is mixed in Mississippi. One commentator has noted that "[f]ailure to make the required findings is one of the most common reasons for reversal of a custody award." Deborah Bell, *Bell on Mississippi Family Law* § 12.03[1] (2011).

> Ideally, the court should (1) list each factor; (2) if a factor is inapplicable, briefly state the reason the factor does not apply; (3) under each relevant factor, discuss the evidence as it relates to each parent; (4) under each factor, indicate which parent appears stronger; and (5) state which parent should be awarded custody, discussing the overall balance of the factors in light of the child's best interests.

18

*Id.*

¶34.    This Court has reversed custody determinations based upon a chancellor's failure to make specific findings on the *Albright* factors. In *Powell v. Ayars*, 792 So. 2d 240, 244 (Miss. 2001), this Court reversed and remanded to the chancellor a custody determination to make findings on each applicable *Albright* factor. The Court "refuse[d] to attempt to correspond the *Albright* factors to the evidence found within the record. . . ." *Id.* That case was reversed even though the chancellor discussed the evidence presented at trial.

¶35.    However, in *Sobieske v. Preslar*, 755 So. 2d 410, 411-12 (Miss. 2000), this Court held that, under the circumstances of the case, the chancellor's failure to analyze the *Albright* factors was not reversible error. "While it certainly would have been preferable for the Chancellor to have expressly considered each *Albright* factor, it is perhaps understandable that he did not do so in the present case, given that the testimony established that both [parents] were fit and loving parents." *Id.* at 412. There, both parents testified that the other was a good and loving parent, and other witnesses testified to the same. *Id.* The Court said that it would have "greater confidence" in the ruling if the chancellor had conducted an *Albright* analysis, but "it can be inferred from his citation to *Albright* that he felt that both parents were fit under *Albright*, and we can not say that he abused his discretion in emphasizing that Carley has more friends and relatives in the Corinth area and in awarding custody to Ricky, at least in part, on that basis." *Id.* at 413.

¶36.    The facts of this case lend themselves toward the Court's determination in *Sobieske*. The chancellor did not conduct a detailed analysis of the *Albright* factors on the record. She did state that she had weighed the factors, however. Additionally, significant evidence was

adduced by each party which was relevant to the *Albright* factors and the determination of custody.  In its ruling, the chancellor stated:

> Based upon the *Albright* factors, and I can enumerate them, but in the [interest] of time, let me just say that I have weighed the *Albright* factors and also the actions of Mr. Huseth in leaving the family and find that the mother is awarded the primary care and custody of the minor child of the parties.

¶37.    In her order granting sole physical custody of the child to Tavia, the chancellor stated:

> It is in the best interests of the minor child that the parties share joint legal custody and that Tavia be awarded sole physical custody. Tavia and Mike are hereby awarded joint legal custody. Tavia is hereby awarded sole physical custody of the minor child, subject to Mike's rights of visitation as set forth below. . . .

¶38.    Each parent testified that the other was a good and loving parent, as in *Sobieske*. While Tavia expressed some complaints about Mike's parenting, she nevertheless testified that he was a good and loving father. Additional testimony from other witnesses corroborated that assertion. The chancellor did find that it was in the best interest of the minor child to be in the sole physical custody of Tavia. Additionally, the chancellor noted that the child should have "a consistent, regular schedule at his home, which is with the mother." This speaks to the *Albright* factor of stability of the home environment. Clearly, the chancellor considered it. Additionally, on appeal, Mike asserts that joint custody is in the best interest of their child. However, he never pled for joint custody. His request, as pled, was for sole custody. At trial, he testified that he wanted joint custody, but he never amended his pleadings in that regard.

¶39.    In light of the amount of evidence adduced at trial that was relevant to the *Albright* factors, the fact that each parent was shown to be a good parent, and the chancellor's indication that she had considered the factors by noting the stability achieved by the child's

20

staying with his mother, we find that *Sobieske* is controlling, and consequently, we affirm the chancellor's custody determination. Additionally, Mike's argument that the chancellor erred in giving him too little visitation time is without merit. The visitation schedule is within statutory guidelines, and the chancellor's decision is not manifestly wrong or against the weight of the evidence.

**V.      Whether the chancellor erred in awarding attorney fees and in awarding them in the amount of $25,000, and whether this Court should award Tavia attorney fees in the amount of $12,500 for litigating this appeal.**

¶40.    The chancellor awarded Tavia $25,000 in attorney fees, finding that the amount of $30,000 was reasonable. She assigned that amount based only upon the present separate maintenance and custody action, and not on the prior divorce action which Mike had dismissed. The chancellor found that Tavia had the ability to pay $5,000, and that Mike therefore was responsible for $25,000. Mike argues that this is excessive, and that he is unable to pay it. Tavia argues that Mike's attempt to gain sole custody was frivolous, and that the chancellor's award was reasonably based upon Mike's misconduct.

¶41.    Chancellors have broad discretion to determine attorney fees. *Smith v. Smith*, 614 So. 2d 394, 398 (Miss. 1993). "We are 'reluctant to disturb a chancellor's discretionary determination whether or not to award attorney fees and of the amount of [any] award." *Id.* (quoting *Geiger v. Geiger*, 530 So. 2d 185, 187 (Miss. 1988)). Initially, we find that the chancellor's determination that $30,000 was a reasonable amount for attorney fees is supported by substantial evidence and is not manifestly wrong. The bill was admitted into evidence and the attorney testified about the reasonableness of the fees. Therefore, the

21

amount of attorney fees is affirmed. It is another question, however, whether Mike should be responsible for $25,000 of the bill. In awarding the attorney fees, the chancellor wrote:

> The Court is in the opinion that Tavia Huseth is entitled to attorney fees. Ms. Huseth has impressed upon the court her inability to pay all of her attorney fees. Additionally, there have been a number of decisions upholding the award of attorney's fees to one party where the other party's actions caused additional legal fees to be incurred. ***Chesney v. Chesney***, 849 So. 2d 860, 863 (Miss. 2002). Testimony was offered that Michael Huseth initiated the custody action and it was meritless.

¶42. At trial, Tavia's attorneys submitted their bill into evidence. Her attorney, William Wright, also testified and submitted to questioning by Mike's attorney, Mark Chinn. Chinn stated that he did not object to Wright's hourly rate or the rates of his staff, his qualifications, or the entries on his bill; he simply wanted to understand the necessity of all the expense. Wright contended that Mike's petition for sole custody clearly was not made in good faith, since he had testified that he really wanted joint custody but filed for sole custody so that he could negotiate with Tavia. He also argued that Tavia was entitled to attorney fees because Mike was the one who had left the marriage and the one who had caused the chancery proceeding to occur.

¶43. Tavia argues that her inability to pay, combined with Mike's allegedly frivolous suit for sole custody, justify the award. She cites the Litigation Accountability Act of 1988, which provides, in pertinent part:

> [I]n any civil action . . . the court shall award . . . reasonable attorney's fees and costs against any party or attorney if the court, upon the motion of any party or on its own motion, finds that an attorney or party brought an action, or asserted any claim or defense, that is without substantial justification, or that the action, or any claim or defense asserted, was interposed for delay or harassment, or if it finds that an attorney or party unnecessarily expanded the proceedings by other improper conduct. . . .

22

Miss. Code Ann. § 11-55-5 (Rev. 2004). Similarly, our Rules of Civil Procedure state: "If any party files a motion or pleading which, in the opinion of the court, is frivolous or is filed for the purpose of harassment or delay, the court may order such a party, or his attorney, or both, to pay to the opposing party or parties the reasonable expenses incurred by such other parties and by their attorneys, including reasonable attorneys' fees." M.R.C.P. 11(b).

¶44. Tavia cites this Court's holding in *In re Spencer*, 985 So. 2d 330 (Miss. 2008), in which this Court affirmed a chancellor's findings that several motions filed by a party were frivolous because they had no hope of success. She argues that, similarly, this chancellor awarded the fees based on Mike's misconduct. In *Spencer*, this Court noted that "a pleading is frivolous 'only when, objectively speaking, the pleader or movant has no hope of success.'" *Id.* at 339 (quoting *City of Madison v. Bryan*, 763 So. 2d 162, 168 (Miss. 2000)). Tavia argues that Mike's petition for custody was frivolous, as it was intended only to bring her to the negotiating table. However, that does not mean that the petition had no hope of success. Objectively, it was possible that Mike's petition could have been granted. Mike's intentions in filing the pleading are irrelevant, because the pleading itself was capable of succeeding. Accordingly, the pleading is not frivolous, and Rule 11 sanctions are not appropriate.

¶45. However, the chancellor still has discretion to award attorney fees based upon a party's misconduct. "A party who incurs legal fees as the result of another's conduct may be awarded fees without regard to need." *Bell on Mississippi Family Law* § 10.03[1]. "There have been a number of prior decisions upholding the award of attorney's fees to one party where the other party has been found to be in contempt of court or where that party's actions

23

caused additional legal fees to be incurred." ***Chesney v. Chesney***, 849 So. 2d 860, 863 (Miss. 2002). There, this Court reversed the Court of Appeals' denial of attorney fees based upon the petitioner's ability to pay them. ***Id.*** This Court held that the chancellor's reasoning behind awarding the fees, which was to impose sanctions for "conduct during the pendency of the case that obstructs litigation and results in additional fees," justified the award regardless of the petitioner's ability to pay her attorney. ***Id.***

¶46.    Here, the chancellor was presented evidence regarding Tavia's attorney fees, which totaled more than $47,000. The trial court limited the fees to the portion that was incurred in the defense of Mike's custody petition, and found that $30,000 was a reasonable amount. She found that Mike's petition for sole custody of the child was meritless, since he actually had wanted joint custody, and Tavia stated that the matter would have been settled long ago if that had been all that he requested. The chancellor found that Tavia could pay $5,000, and Mike could pay $25,000. Based upon ***Chesney***, we cannot say that the chancellor abused her discretion or was manifestly wrong. Therefore, we affirm the chancellor's award of attorney fees.

¶47.    However, we deny Tavia's request for $12,500 in attorney fees on appeal. Typically, this Court awards attorney fees on appeal in an amount equal to half the amount awarded at trial. ***Monroe v. Monroe***, 745 So. 2d 249, 253 (Miss. 1999) (quoting ***Klumb v. Klumb***, 194 So. 2d 221, 225 (Miss. 1967)). In ***Monroe***, the Court denied attorney fees because the petitioner "presented no evidence . . . of the fees charged by her attorney or of the amount of work involved." ***Monroe***, 745 So. 2d at 253. Tavia has presented no evidence of the fees charged by her attorney or the amount of work involved on appeal. Further, as noted by the

24

Court in *Monroe*, the fees awarded in *Klumb* were awarded to the *prevailing* party. *Monroe*, 745 So. 2d at 253. Tavia has not prevailed. Therefore, we deny her request for attorney fees on appeal.

## CONCLUSION

¶48. We affirm the judgment of the chancellor in part and reverse it in part. The chancellor's grant of separate maintenance and child support was supported by substantial evidence and was not manifestly wrong. The chancellor's determination of the amount of imputed income was not supported by sufficient findings by the chancellor, and in the absence of her specific computation of the amount, we must reverse and remand for specific findings detailing how the chancellor arrived at that amount, and upon what she relied. Because we reverse and remand for a new finding of imputed income, we also must reverse and remand the chancellor's determination of child support, in which the chancellor shall consider all of the facts and circumstances regarding the parties' ability to support the child, rather than relying on the statutory guidelines. Further, the chancellor's award of separate maintenance did not take into account Mike's necessary living expenses, and therefore must be reversed. The amount of separate maintenance may be based upon imputed income, but the amount of that income that goes towards living expenses must be considered. The chancellor should have conducted an *Albright* analysis in awarding custody and visitation, but the record reveals that she did consider those factors, and the evidence supported her judgment, and we therefore affirm the chancellor's custody and visitation determinations. We affirm the award of $25,000 in attorney fees to Tavia, because the chancellor's decision was

not manifestly wrong. Finally, because Tavia offered no evidence concerning her actual costs in litigating this appeal, we deny her request for $12,500 in attorney fees for the appeal.

¶49. **AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

**WALLER, C.J., DICKINSON, P.J., KING AND COLEMAN, JJ., CONCUR. RANDOLPH, P.J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. PIERCE, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J., LAMAR AND CHANDLER, JJ.**

**PIERCE, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶50. I respectfully concur in part and in result only. My opinion parts ways with my learned colleagues based on the majority's use of *Houston v. Houston*, because I disagree with the holding in that case. *Houston v. Houston*, 121 So. 3d 283 (Miss. Ct. App. 2013). This Court was unable to speak to the issues in *Houston*, as writ of *certiorari* was not filed with this Court. As the majority opinion states, in *Houston*, the Court of Appeals upheld the trial court's decision to include monetary gifts from the wife's parents when calculating her income during the determination of whether she would be awarded alimony. *Id*. However, this Court has held that gratuities from parents may not be included when considering the income of the payee to determine an award of separate maintenance. *Robinson v. Robinson*, 554 So. 2d 300, 305 (Miss. 1989) (citing *McNeil v. McNeil*, 127 Miss. 616, 90 So. 327, 329 (1922)). Specifically, this Court has stated the following:

> We do not think it proper to consider mere gratuities given to the complainant by her father. The duty to support the wife rests upon the husband, and he cannot avoid the performance of this duty by showing that the father will probably see that the wife does not suffer because the father is able to do so and is manifesting a disposition to meet the wants of the daughter.

*Robinson*, 554 So. 2d at 305 (citing *McNeil*, 127 Miss. 616, 90 So. at 329).

26

¶51. Because the situation before us involves a *payor* receiving gratuities from his parents, it differs factually from the situation in both **Robinson** and **McNeil**, where gratuities were bestowed upon the *payee*. Nevertheless, the analysis remains the same. Monetary gifts from Mike's parents should not be included in the amount of imputed income. If it is found that Mike should provide separate maintenance, it is his duty alone to provide that support. Based on Mike's education and work history, it is not improper to impute income as long as a determination of Mike's earning capacity and current income does not include gratuities from his parents.

¶52. I agree with the majority's opinion that this case should be remanded. The trial court must determine Mike's earning capacity without any consideration of the parents' contributions.

**RANDOLPH, P.J., LAMAR AND CHANDLER, JJ., JOIN THIS OPINION.**