# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-CA-01334-SCT

*AUBREY M. EDWARDS*

*v.*

*WILLIAM BRAD EDWARDS*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/04/2023 |
| TRIAL JUDGE: | HON. KILEY CATLEDGE KIRK |
| TRIAL COURT ATTORNEYS: | ALEXIS DANIELLE BANKS |
| | MARK G. WILLIAMSON |
| COURT FROM WHICH APPEALED: | CHOCTAW COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | KELSEY LEIGH DISMUKES |
| ATTORNEY FOR APPELLEE: | MARK G. WILLIAMSON |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 11/06/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KING, P.J., MAXWELL AND BRANNING, JJ.**

**BRANNING, JUSTICE, FOR THE COURT:**

¶1.     Aubrey Edwards appeals from the Choctaw County Chancery Court's judgment of divorce awarding her ex-husband Brad Edwards primary physical custody of their daughters. On appeal, Aubrey argues (1) that the trial court committed manifest error in its *Albright*[1] analysis; (2) that the trial court erred by denying Aubrey's motion for new trial; and (3) that the trial court erred by denying Aubrey's motion for recusal. Finding no reversible error, we affirm.

---

[1]*Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

## FACTS AND PROCEDURAL HISTORY

¶2.     Aubrey and Brad were married on May 14, 2013.  The couple's first child (M.G.E.) was born in 2017, and their second child (A.C.E.) was born in 2018.  Brad described his family as very close-knit and loving.  He and Aubrey lived next door to Brad's parents, who had been married for more than forty years.  Brad stated that he would see his parents almost daily, having his mother close by to help with the children.  Aubrey, on the other hand, came from a different situation.  She grew up in a home of hardship, neglect, and sometimes violence.  She openly admitted a suicide attempt at age fourteen and again in 2019, and she testified about her continued struggle with depression and anxiety into adulthood. Two members of her family committed suicide.  In her early adult years, she began to break ties with certain family members to create a more stable life for herself.  As a result, she did not have a family network from which to draw emotional support but, instead, had support from friends and coworkers.  She continued to work full time while coping with her mental-health challenges and helping to raise her young children.

¶3.     Regarding Brad and Aubrey's marriage, there was conflicting testimony from the parties regarding who handled more of the domestic duties and who was the best caregiver for the children.  Brad expressed disdain for Aubrey's lack of connection with his family or her choice not to eat meals with them, while Aubrey vocalized her concern for Brad's controlling nature and alcohol consumption.  In 2020, the couple had a disagreement over a cell phone, which resulted in Aubrey locking herself in the bathroom and threatening suicide.  Aubrey went to the hospital by ambulance and was discharged later that night with

2

instructions to follow up with her mental-health provider. Because Brad did not accompany her to the hospital or answer her phone calls after being discharged, she proceeded to walk home. She was several miles into her early-morning walk home when a sheriff's deputy transported her home in time to get dressed for work that morning.

¶4. It was apparent from the testimony at trial that a severe breakdown in communication and cooperation developed between the parties and, in April of 2020, separation resulted. At trial, the parties each illustrated their respective version of events leading to the separation, including Brad's alcohol consumption and mistreatment of Aubrey, Aubrey's chronic depression, and the relationship between Brad's family and Aubrey.

¶5. On April 22, 2020, Brad filed a complaint for divorce on the grounds of cruel and inhuman treatment or, in the alternative, irreconcilable differences. In addition to the complaint, Brad filed a petition requesting temporary physical and legal custody of the children with supervised visitation for Aubrey and requesting that Aubrey be required to pay Brad child support and legal fees. In her counterclaim, Aubrey alleged cruel and inhuman treatment, habitual drunkenness, and, in the alternative, irreconcilable differences.

¶6. The trial court entered a temporary order on May 15, 2020, requiring the parties to alternate physical custody every fifteen days with the children remaining in the marital home. Shortly thereafter, the parties agreed to an irreconcilable-differences divorce, leaving the issues of child custody and support to the chancellor. The trial court found that two of the *Albright* factors (mental health and moral fitness) slightly favored Brad and, therefore, awarded Brad primary physical custody, with the parties sharing joint legal custody.

3

Aggrieved, Aubrey appeals.

<u>**STANDARD OF REVIEW**</u>

¶7.     This Court applies a limited standard of review in child-custody cases. ***Floyd v. Floyd***, 949 So. 2d 26, 28 (Miss. 2007). "We give deference to the chancellor's factual findings, asking if they were supported by substantial evidence." ***Id.*** at 26. "Reversal only occurs if a chancellor is manifestly wrong or applied an erroneous legal standard." ***Id.*** (citing ***Powell v. Ayars***, 792 So. 2d 240, 243 (Miss. 2001)). "It is for the chancellor to determine the credibility and weight of evidence." ***Powell***, 792 So. 2d at 243 (citing ***Chamblee v. Chamblee***, 637 So. 2d 850, 860 (Miss.  1994)).

<u>**DISCUSSION**</u>

¶8.     Aubrey claims the trial court erred in its analysis of two ***Albright*** factors.  In particular, she maintains that the trial court improperly found that the mental-health and moral-fitness factors slightly favored Brad.

*I.      The Albright Analysis*

¶9.     "The polestar consideration in child custody cases is the best interest and welfare of the child." ***Albright***, 437 So. 2d at 1005.  We consider the following factors introduced in ***Albright***: (1) the age, sex, and health of the child; (2) the continuity of care prior to the separation; (3) the parenting skills of each parent; (4) the willingness and capacity to prove primary child care; (5) the employment of the parents and the responsibilities of that employment; (6) the physical and mental health and age of the parents; (7) the emotional ties of the parent and the child; (8) the moral fitness of each parent; (9) the home, school, and

4

community record of the child; (10) the preference of the child; (11) the stability of the home environment; and (12) other factors relevant to the parent-child relationship. *Id.* "In order to determine whether or not the chancellor was manifestly wrong, clearly erroneous or abused his discretion in applying the *Albright* factors, this Court reviews the evidence and testimony presented at trial under each factor to ensure the chancellor's ruling was supported by the record." *Hollon v. Hollon*, 784 So. 2d 943, 947 (Miss. 2001). The *Albright* factors are a guide. They are "not the equivalent of a mathematical formula." *Lee v. Lee*, 798 So. 2d 1284, 1288 (Miss. 2001).

### a.      *Mental-Health Factor*

¶10.    Aubrey asserts that the trial court erroneously gave too much weight to the evidence regarding her troubled childhood, the mental health of her family members, and her depression when considering the mental-health factor of *Albright*. While she openly admitted her difficult family history and past struggles with depression, she now argues that there was not sufficient evidence to suggest her depression negatively impacted her ability to care for her children.

¶11.    First, we disagree that the trial court abused its discretion in the handling of evidence offered about Aubrey's childhood or estranged family's mental health. During the trial, questions were raised about two of Aubrey's family members' having committed suicide, but the trial court sustained Aubrey's objections, noting that "what our family members may do will not impact how we parent" and that "part of the equation is not what family members do." As finder of fact in child-custody matters, this Court has held that the chancellor must

5

consider all relevant factors applicable to the facts of case at hand. *Garner v. Garner*, 283 So. 3d 120, 140 (Miss. 2019). Also, the chancellor holds the responsibility to "determine ultimately what weight and worth to afford any particular aspect of proof." *Id.* (internal quotation mark omitted) (quoting *Johnson v. Johnson*, 872 So. 2d 92, 95 (Miss. Ct. App. 2004)). Accordingly, we find this issue to be without merit.

¶12. Next, we examine the trial court's mental-health analysis under *Albright* as it relates to Aubrey's depression. At trial, Aubrey freely acknowledged her past sufferings from chronic depression as well as postpartum depression following the birth of the couple's youngest child in 2018. She admitted to past suicide attempts, once at age fourteen and another in 2019. Aubrey then discussed proactive steps she took to seek and obtain the necessary help for this condition and said that she was only seeing her counselor on an as-needed basis. Additionally, a Mississippi Department of Child Protection Services (CPS) social worker conducted at least two home visits (one unannounced) and cited no concerns about the condition of the home, the well-being of the children, or Aubrey's ability to care for them.

¶13. But Brad testified about his concerns regarding Aubrey's parental abilities due to her mental-health challenges. He described the April 14, 2020, incident as "an attempted suicide" when he found her in the bathroom bleeding after she had cut herself. Brad then called an ambulance, out of "concern for the safety of [the] two children." Brad indicated that Aubrey had several deep self-inflicted cuts in her thigh, but there were no notes in the medical records concerning lacerations. In fact, Aubrey explained that the cuts were very

6

superficial and that the bleeding had stopped by the time the paramedics arrived. The evaluation by the Choctaw Regional Medical Center explained that while Aubrey "reiterates that she is not contemplating suicide," she remains "at high risk for suicide given her past attempts and poor psycho-social dynamics." She did not meet the threshold for inpatient treatment at that time, so she was released that same night with instructions to follow up with her mental-health provider.

¶14.    On appeal, Aubrey argues that the chancellor erroneously failed to make a specific finding that her mental-health struggles affected her parental abilities and that the opinion "demonizes Aubrey's diagnosis." She points to various cases from the Court of Appeals dealing with the mental-health analysis of *Albright* and suggests that a specific written finding of detrimental impact on the children was required. She further suggests that affirming the chancellor's decision would result in a requirement of perfect mental health for any parent seeking custody of their children. We disagree; *Albright* remains a totality-of-the-circumstances test.

¶15.    While this Court prefers specific findings of fact in an *Albright* analysis, we have found that failure to make specific findings does not always constitute reversible error depending on the circumstances of the particular case. *Huseth v. Huseth*, 135 So. 3d 846, 858 (Miss. 2014) (citing *Sobieske v. Preslar*, 755 So. 2d 410, 411-12 (Miss. 2000)). In *Huseth*, 135 So. 3d at 857, this Court acknowledged that Mississippi law has been mixed in the area concerning the contents of the *Albright* analysis. We held that even though "[t]he chancellor did not conduct a *detailed* analysis of the *Albright* factors on the record[,] . . .

7

[s]he did state that she had weighed the factors . . . [based on the] evidence [that] was adduced by each party," and therefore, the omission was not reversible error. *Huseth*, 135 So. 3d at 858 More specifically, this Court has held that a chancellor is not required to make a specific written finding that a parent's mental-health disorder detrimentally impacted the child. *Kerr v. Kerr*, 323 So. 3d 462, 480 (Miss. 2021). And while it seems perfectly plausible for a finding of detrimental impact to be afforded more weight under the *Albright* mental-health analysis, chancellors as the fact-finders "ha[ve] the ultimate discretion to weigh the evidence the way he sees fit." *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (Miss. 2003). We will not reverse the decision of the trial court in such matters when we can confidently say that the chancellor thoroughly reviewed the evidence and made an accurate, well-supported determination under each factor. *Kerr*, 323 So. 3d at 480; *see also Hayes v. Rounds*, 658 So. 2d 863, 866 (Miss. 1995).

¶16.    In the present case, the chancellor heard extensive testimony on Aubrey's mental-health challenges, which included her self-reported improvements and testimony from her friends, coworkers, and a CPS caseworker. The chancellor also heard Brad's first-hand account of Aubrey's struggles, in light of his concern for the safety of the children, coupled with Aubrey's medical evaluation of being a "high risk for suicide." As a result, the chancellor addressed each *Albright* factor in his twenty-nine-page opinion, holding that in "consider[ation] of all of the *Albright* factors and [in] consider[ation] [of] the totality of the circumstances[,]" the mental-health factor *marginally* favored Brad. We note that chancellor's mental-health analysis did not include a specific finding that Aubrey's mental-

8

health challenges affected her ability to be a good parent. While it would have been helpful to this Court to see the specific finding, because the decision was supported by substantial evidence, we find no reversible error.

### b. Moral-Fitness Factor

¶17. Next, Aubrey claims that the chancellor erred by finding that the moral-fitness factor favored Brad. While she does not deny post-separation relationships, she contends that these relationships had no effect on the children and should not have been considered by the trial court.

¶18. The trial court is correct that marital fault may not be used as a sanction when applying the *Albright* factors. Adultery should be considered in evaluating moral fitness, but it should not be given undue weight. *Brekeen v. Brekeen*, 880 So.2d 280, 286 (Miss. 2004). "Adultery of a parent may be an unwholesome influence and an impairment to the child's best interest, but on the other hand, may have no effect." *Carr v. Carr*, 480 So. 2d 1120, 1123 (Miss. 1985).

¶19. More specifically, Aubrey relies on *Lawrence v. Lawrence*, 956 So. 2d 251 (Miss. Ct. App. 2019), in her claim that the trial court erred on this issue absent a finding of a specific adverse effect to either child. In *Lawrence*, 956 So. 2d at 260, the Court of Appeals found the trial court had erred by granting considerable weight to the mother's extramarital affair because it had little impact on the children. But we find her reliance on *Lawrence* to be misplaced. In *Lawrence*, 956 So. 2d at 260, the trial court found that both parents had engaged in extramarital affairs in addition to the husband's extreme violence, thus the

9

*Albright* analysis there focused on which parent's adultery had the least effect on the children when all factors were considered as a whole. That case may be easily distinguished from the present case in which Aubrey was the only party that admitted extramarital affairs.

¶20. While Aubrey seemed to have made efforts to keep her children away from her male friends on most occasions, there were specific instances when the children spent time with one boyfriend. The trial court found that "Aubrey began adulterous relationships with many men. . . . The evidence indicates the children's exposure to a number of these men." The trial court ultimately found that the children's exposure to such relationships "might confuse the children - as if what has occurred between her husband and herself wasn't enough." Therefore, we find this issue to be without merit.

### II.     Motion for New Trial

¶21. Following the custody trial and final judgment, Aubrey filed a motion for new trial, which the trial court ultimately denied. On appeal, Aubrey contends that the trial court erred in its determination that the moral-fitness factor of *Albright* favored Brad, entitling her to a new trial. Based on the same reasoning regarding the moral-fitness determination already addressed, we find this issue to be without merit.

### III.    Motion for Recusal

¶22. Lastly, Aubrey challenges the chancellor's denial of her post-trial motion for recusal. She argues that the chancellor's conduct and statements during the trial clearly displayed a level of bias and partiality against her, warranting a recusal.

¶23. This Court has held that "a judge is required to disqualify himself if a reasonable

person, knowing all the circumstances, would harbor doubts about his impartiality." *Johnson*, 859 So. 2d at 1015 (internal quotation marks omitted) (quoting *Buchanan v. Buchanan*, 587 So. 2d 892, 895 (Miss. 1991)). Canon 3 of the Code of Judicial Conduct places a burden on courts to use an objective standard in deciding whether a judge should have disqualified themselves from hearing a case. *Tubwell v. Grant*, 760 So. 2d 687, 689 (Miss. 2000). "The presumption is 'that a judge, sworn to administer impartial justice, is qualified and unbiased.'" *Buchanan*, 587 So. 2d at 895 (quoting *Turner v. State*, 573 So. 2d 657, 678 (Miss. 1990)). The movant bears the heavy burden then to overcome this presumption by offering evidence sufficient to cause reasonable doubt about the judge's impartiality. *Id.*

¶24. To support her assertions, Aubrey lists several situations, during trial and in his final opinion, in which she questions the chancellor's impartiality. Most of these instances involve the chancellor's commentary and approach to each party during their testimonies. For example, during Brad's testimony, the chancellor asked him a series of questions regarding Aubrey's mental health. The following exchange occurred between the chancellor and Brad during the examination:

> Q. Now, when she was threatening to do these things, was it her way of reaching out to tell you, something is going on. We need to talk about it?
>
> Or did you truly feel like she's going to harm herself and your child?
>
> A. For the most part, I felt like it was a bully tactic, or mind game she wanted to do, or something she wanted to buy.

11

> Q. If that is, in fact, the case, that's tough. That would mean she'll go to any length to manipulate an issue. Is that what you're telling me?
>
> A. That's what I'm telling you. Yes, sir.

(Emphasis added.) This line of questioning about Aubrey continued on, with the chancellor eventually commenting that "[t]his lady needs some help."

¶25. Also, the chancellor began his moral-fitness analysis in the judgment with the statement that "[d]uring the course of their marriage, Aubrey began adulterous relationships with many men." He characterized Aubrey's testimony about her relationships as "cavalier," stating that she "paraded around" her children's positive sentiments about her current boyfriend. The chancellor also discussed these relationships with Brad during his testimony about Aubrey's moral fitness, with the court asking the following questions:

> Q. You mentioned something on cross dealing with the GPS or pictures, something like that. I have written down that you have tracked her to her boyfriend's house, but you also coupled that language with – or you were asked – were the children present – or – you said yes, ma'am. That's what I understood.
>
> A. Yes, the children were with her at her boyfriend's house several times.
>
> . . . .
>
> Q. Okay.
>
> A. When she leaves our house, she's not stopping anywhere else; so, either the children are with her, or she's leaving them at home.
>
> Q. By themselves? Is that what you mean?
>
> A. Of course. Yes, sir. I have another boyfriend, as well, your Honor.
>
> Q. Well, that is extra-marital relations, according to *Albright*. It falls within one factor. You can't screw up custody just for that so-to-speak.

12

But, when you say one more boyfriend, I'm interested in – are the children being exposed to whomever?

A.     Yes.

Q.     *She may have 15* [boyfriends].

(Emphasis added.)

¶26.   Later in the trial, Aubrey testified that Brad had raped her and forced her into several unwanted sexual encounters. The following exchange between the chancellor and Aubrey occurred during the chancellor's own examination of Aubrey:

Q.     . . . You've indicated that Brad had raped you?

A.     He did; yes.

Q.     Now, this is where is gets a little difficult – and I know we're strangers

        –

A.     That's okay.

Q.     This has got to be – its tough on me asking. How about that?

        Do you think that, perhaps, Brad had the belief that you were inclined to want to have sex, and then said, I don't want to, and then you just ended up having it?

A.     I repeatedly told him no that night.

Q.     What night was that and how long ago was it?

A.     It was October 19, 2018. It was my birthday.

        And I told him no because we had a 9-week old baby at the time who slept in her crib right beside me. I had just gotten her down to sleep. I was exhausted. I was not in the mood because he had not treated me well that entire day. Why would I have sex with him on my birthday, after telling him no multiple times?

13

Q. *Did he hear you say no? Maybe he didn't somehow.*

A. He heard.

Q. *How do you know he heard?*

A. Because he kept trying to coax me into it and I was - -

(Emphasis added.) While we find that some of the comments made during the course of the trial to be concerning, we do not feel that those comments rise to the level of the standard suggested by ***Schmidt v. Bermudez***, 5 So. 3d 1064, 1066-72 (Miss. 2009), in which this Court held that the chancellor's combative and discourteous conduct toward the wife deprived her of a fair trial.

¶27. In ***Schmidt***, after much testimony surrounding the mother's interaction with her son, the trial judge stated, "[i]t sounds like she needs a psychologist," ***id.*** at 1068, similar to one made by the trial court here that "[t]his lady needs some help." But the trial judge's actions in ***Schmidt*** were compounded by his repeated insults and badgering of the witness during cross-examination before she presented her case-in-chief. At one point, the trial judge even told the mother that "I think you are sick right now, the way you are doing" and that "I think you've got a psychologist with a yo-yo head," among other highly inappropriate comments.

¶28. In the present case, we find that the chancellor did a thorough job of fact-finding; however, we also find that, while some comments made were concerning and likely to be garnered in the passion of the fact-finding mission, the chancellor's actions do not rise to the level that warrants recusal. Therefore, we find this issue to be without merit.

## CONCLUSION

¶29.   We affirm the trial court's decision.

¶30.   **AFFIRMED.**

**RANDOLPH, C.J., KING, P.J., MAXWELL, CHAMBERLIN, ISHEE, GRIFFIS AND SULLIVAN, JJ., CONCUR. COLEMAN, P.J., NOT PARTICIPATING.**