# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-01727-COA

**MARCIA LOPEZ ROBLES**                                              **APPELLANT**

**v.**

**JOSE FRANCISCO GONZALEZ**                                          **APPELLEE**

DATE OF JUDGMENT:               11/01/2016
TRIAL JUDGE:                    HON. JOHN C. MCLAURIN JR.
COURT FROM WHICH APPEALED:      RANKIN COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:        JOHN MICHAEL DUNCAN
                                CHRISTOPHER TYLER KENT
ATTORNEYS FOR APPELLEE:         NATHAN HENRY ELMORE
                                JANE E. TUCKER
NATURE OF THE CASE:             CIVIL - CUSTODY
DISPOSITION:                    REVERSED AND REMANDED - 05/15/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE GRIFFIS, P.J., CARLTON AND WILSON, JJ.

### CARLTON, J., FOR THE COURT:

¶1.     Marcia Robles filed a complaint for divorce against her husband, Jose Gonzalez. The Rankin County Chancery Court entered a judgment granting Robles and Gonzalez an irreconcilable-difference divorce. In his judgment, the chancellor also made an equitable division of the martial property and awarded Robles and Gonzalez joint legal and physical custody of their two minor children.

¶2.     Robles now appeals the chancellor's final judgment, arguing that the chancellor erred by failing to make an on-the-record finding of each applicable *Albright*[1] factor when

---

[1] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

awarding Robles and Gonzalez joint custody of the minor children. Finding error in the chancellor's final judgment, we reverse this case and remand to the chancellor for further proceedings consistent with this opinion.

**FACTS**

¶3. Robles and Gonzalez were married in Mexico in September 2006. After their marriage ceremony, Robles and Gonzalez resided in Rankin County, Mississippi. On October 28, 2015, Robles filed a complaint for divorce against Gonzalez based on irreconcilable differences and habitual cruel and inhuman treatment. She also requested sole legal and physical custody of the parties' two minor children, J.P. and J.[2] The record reflects that Robles has two additional biological children from a previous relationship, and Gonzalez has three additional biological children from a previous relationship. Robles's two additional biological children lived in the marital home along with Robles, Gonzalez, J.P., and J. Gonzalez filed his answer and counterclaim to the complaint on December 17, 2015.[3]

_____

[2] For anonymity purposes, this Court has chosen to use the initials of the children.

[3] Robles served Gonzalez with a copy of her complaint for divorce on November 10, 2015. Gonzalez filed his answer and counterclaim on December 17, 2015, more than thirty days after he had been served with the complaint for divorce. Robles filed a motion to strike Gonzalez's answer and counterclaim as untimely filed. Gonzalez filed a response to Robles's motion to strike, wherein he alleged that Robles "did not file her Affidavit of Service, dated November 10, 2015, until January 6, 2016 . . . ; therefore, [Gonzalez's] counsel had no way of knowing on which date the summons was actually served." The record contains no ruling on this motion. The Mississippi Supreme Court has held that "the affirmative duty to obtain a ruling on a motion rests upon the party filing the motion to follow up his action by bringing it to the attention of the trial court." *Ramsey v. Auburn Univ.*, 191 So. 3d 102, 112 (¶37) (Miss. 2016). Since Robles failed to obtain a ruling on her motion to strike, we find that she abandoned her argument and failed to preserve for review any issue as to this motion.

¶4. On August 3, 2016, the parties executed a stipulation where they withdrew all enumerated fault grounds for divorce and agreed for the entry of a divorce on the grounds of irreconcilable differences. At a trial on the matter held August 3, 2016 and October 31, 2016, the chancellor heard testimony from Robles and Gonzalez, as well as Maribel Valdez and Liliana Alcazar Cepeda.

¶5. At the trial, Robles testified that during her marriage to Gonzalez, she stayed home and cared for the children. Robles explained that after that she and Gonzalez separated, she obtained employment performing roofing work and cleaning houses, but she maintained a flexible work schedule. Robles testified that J.P. and J. had a good relationship with Robles's two older biological children, and she stated that J.P. and J. would be upset if they had to live apart from their older half-siblings.

¶6. Robles testified that due to a no-contact order issued by the justice court, Gonzalez had only restricted visitation with J.P. and J. Robles explained that she sought the no-contact order after an incident on September 10, 2015, when Gonzalez hit her and "grabbed [her] . . . and . . . threw [her] against a fence." Robles stated that as a result of the alleged assault, she suffered bruising and scrapes on her arms. Robles also stated that she believed that Gonzalez had an anger problem, and she did not feel safe around him. Counsel for Robles entered photographs into evidence, and Robles testified that the photographs depicted the injuries she suffered as a result of Gonzalez's alleged assault on September 10, 2015. Robles denied that she was seeking immigration status based on Gonzalez's alleged assault.

¶7. During cross-examination, Robles confirmed that surrounding the time of the alleged

3

assault, she "commonly text[ed] people up to a hundred or more times a day" and made "sometimes 40, 50 telephone calls a day." When questioned about her parenting skills, Robles admitted that J., who was almost six years old at the time of trial, suffered several injuries, including head and leg injuries and a broken arm, while in her care. Robles testified that J. also suffered extensive tooth decay which resulted in dental work, including nineteen crowns placed on his decayed teeth. Robles admitted that she has slapped one of her older children across the face on one occasion, but she denied ever slapping J.P. or J.

¶8. Robles also testified that when she attends parties, "the children always go with [her]." Robles admitted that people often consume alcohol at the parties, which often last past midnight. Robles stated that on occasion, she drove home with her children after she had consumed alcohol, but she denied ever driving while intoxicated. Robles also testified that she has a Mexican driver's license, but does not have a Mississippi driver's license. The following exchange occurred during cross-examination:

Q. So you are not licensed to drive in the State of Mississippi.

A. Yes.

Q. And yet you drink and drive. Correct?

A. I haven't done it recently.

Q. You've done it before.

A. Yes.

Q. And you did it with your kids in the vehicle.

A. Yes.

4

Q.    Sometimes after midnight.

A.    Sí.

Robles also admitted to possessing and firing a firearm, in violation of 18 U.S.C. § 922(g)(5), which prohibits undocumented immigrants from possessing firearms.

¶9.    At trial, Robles admitted that Gonzalez had filed assault charges against her alleging that on September 8, 2015, Robles became angry at Gonzalez, yelled at him, and punched him in the mouth several times. Robles also admitted that another woman had filed stalking charges against her, and the stalking and assault charges were still pending at the time of trial. When asked about the September 8, 2015 assault charge that Gonzalez filed against her, Robles denied assaulting Gonzalez. She claimed that Gonzalez "hit himself because [Robles] was going to call the police and . . . his lips are very sensitive because he's got braces. He hit himself." Robles also denied striking Gonzalez above the eye on another occasion and claimed that he "made that cut with a bottle cap." Robles asserted that one of Gonzalez's coworkers informed her that Gonzalez is intentionally injuring himself "so he can take [Robles] to court and . . . put [Robles] at fault."

¶10.    Maribel Valdez, one of Robles's friends, testified that she had known the parties for about seven years. Valdez stated that she also supervised Gonzalez's visitations with J.P. and J. Valdez estimated that she performed this duty approximately four times. Valdez testified that after she was late to a visitation, Gonzalez "spoke to [her] in a strong voice, strong way, strong manner." Valdez testified that Robles cared for the children "more often" than Gonzalez, and she would trust Robles to care for her own children.

5

¶11. Liliana Cepeda testified that she worked for the parties for the duration of their marriage cleaning the house and caring for their children. Cepeda stated that even though Robles and Gonzalez were separated, she still takes care of the children. Cepeda testified that after the parties had separated, Robles called Cepeda on the telephone and informed her that she and Gonzalez had had an argument. Robles asked Cepeda to pick her up at the Walgreen's pharmacy in Brandon. Cepeda picked up Robles and brought her to Cepeda's house. While at her home, Cepeda testified that Robles "asked [Cepeda's] cousin to mark her so that she could go [file] charges. She was going to [file] charges for domestic violence so that she could get immigration status here in the United States." Cepeda testified that she witnessed her cousin, Raul Cepeda, making "marks" on Robles. Cepeda also testified that she has witnessed Robles drinking alcohol at parties until 2:00 or 3:00 in the morning, and she then drove home afterwards with her children in the car.

¶12. Cepeda opined that Gonzalez "is a good father. He would take the children to work even when [Robles] was at home. I know that he—he didn't strike [Robles]." Cepeda testified that Gonzalez also played with the children, cooked for them, and took care of them. Cepeda stated that she believed that Gonzalez would do a better job than Robles of taking care of J.P. and J.

¶13. Gonzales testified that he is a legal permanent resident of the United States and that he has worked in construction doing roofing work for twenty years. Gonzalez stated that he earns approximately $50,000 a year. Gonzalez testified that he works Monday through Friday. Gonzalez estimated that he arrives at work each day between 7:00 or 8:00 a.m. and

6

leaves work between 4:00 and 7:00 p.m. Gonzalez testified that he usually does not work on the weekends. Gonzalez admitted that he drinks alcohol on occasion, but he denied that he had ever driven a vehicle after consuming alcohol.

¶14. Gonzalez stated that he spends a lot of time with his children, including the two children from Robles's prior relationship. Gonzalez also testified that he often cooked meals for the family. Gonzalez expressed concern that Robles was not providing J.P. and J. with proper nutrition because the two boys had gained a significant amount of weight after he and Robles separated.

¶15. Gonzalez testified about the assault charge he filed against Robles, and he informed the chancellor that on September 8, 2015, he and Robles had an argument regarding a meal for the children. Gonzalez stated that the argument resulted in a physical altercation where Robles hit him in the mouth and scratched him with her fingernails. Gonzalez also testified that on April 18, 2016, he ran into Robles and another man at a club. Gonzalez stated that Robles's date, Luis Garza, "came over to provoke [him]" and that Robles then approached Gonzalez and punched him in the face.

¶16. Regarding the assault charges Robles filed against him, Gonzalez admitted to having an argument with her on September 10, 2015, but he denied assaulting her. Gonzalez denied that he had ever hit or assaulted Robles or his children. Gonzalez stated that he had seen Robles hit J.P. and J. on "occasions that they make her mad." Gonzalez also denied Robles's allegations that he had punctured the tires of her vehicle.

¶17. On November 1, 2016, the chancellor entered his final judgment of divorce.

7

Regarding custody of the minor children, the chancellor held that "[a]fter considering and balancing the factors set forth by the Mississippi Supreme Court in *Albright v. Albright*, the Court finds that the parties are comparatively equal and neither party is favored over the other." The chancellor provided that Robles and Gonzalez "shall be granted joint physical and legal custody of the minor children," and he set forth a custody schedule. The chancellor then divided the marital property.

¶18. Robles filed her notice of appeal on December 1, 2016. On appeal, Robles argues that the chancellor's failure to specifically discuss the *Albright* factors when making his determination of child custody constitutes reversible error.

## STANDARD OF REVIEW

¶19. This Court's standard of review regarding child custody is limited. *C.W.L. v. R.A.*, 919 So. 2d 267, 270 (¶8) (Miss. Ct. App. 2005). On appeal, this Court will reverse a chancellor's child-custody decision "only if a chancellor is manifestly wrong or applied an erroneous legal standard. This Court will not reverse a chancery court's factual findings, where there is substantial evidence in the record supporting these findings of fact." *Lowrey v. Lowrey*, 25 So. 3d 274, 294-95 (¶51) (Miss. 2009). However, "[a] chancellor's conclusions of law are reviewed de novo." *Id*. at 285 (¶26).

## DISCUSSION

¶20. On appeal, Robles argues that the chancellor committed reversible error by failing to specifically discuss or make on-the-record findings of the factors set forth in *Albright* for child-custody determinations. The Mississippi Supreme Court has established that "[t]he best

8

interest of the child is paramount in any child-custody case." *Wilson v. Davis*, 181 So. 3d 991, 995 (¶7) (Miss. 2016) (quoting *Smith v. Smith*, 97 So. 3d 43, 46 (¶8) (Miss. 2012)). In determining the child's best interests, the trial court considers the following factors:

> (1) age, health and sex of the child; (2) a determination of the parent [who] has had the continuity of care prior to the separation; (3) which has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school[,] and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent and other factors relevant to the parent-child relationship.

*Powell v. Ayars*, 792 So. 2d 240, 244 (¶7) (Miss. 2001) (citing *Albright*, 437 So. 2d at 1005).

¶21. We recognize that "[t]he chancellor is required to address each of the *Albright* factors that is applicable to the case[.]" *Blakely v. Blakely*, 88 So. 3d 798, 803 (¶17) (Miss. Ct. App. 2012). "A determination of child custody will be held erroneous where a chancellor is not thorough in his discussion" of the *Albright* factors. *Powell*, 792 So. 2d at 249 (¶33). "However, the chancellor need not decide that every factor favors one parent over the other." *Blakely*, 88 So. 3d at 803 (¶17). "Instead, the *Albright* factors exist to ensure the chancellor considers all the relevant facts before [he] reaches a decision. All the factors are important, but the chancellor has the ultimate discretion to weigh the evidence the way [he] sees fit in determining where the child's best interest lies." *Id*. (quoting *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003)) (internal quotation marks omitted).

¶22. In this case before us, after the parties rested their cases, the chancellor provided his ruling on the record. The chancellor held as follows:

> The court finds that there were two minor sons born to this marriage: [J.P.], who is presently ten; and [J.], who is presently six. The court when making—making a ruling regarding custody of minor children has been directed by the Supreme Court of Mississippi to consider the factors outlined in the *Albright v. Albright* case. In order to reach that determination, the polestar consideration of this court, being what is in the best interest of the minor children of the parties—not necessarily what is in the best interest of the parents pursuing custody, but what the court determines is in the best interest of these two minor children.
>
> The court has considered all of the evidence and testimony in light of the enumerated *Albright* factors and finds that these two parents are comparatively equal regarding those factors—or put another way, that neither party is favored over the other party in employing the *Albright* balancing test—and, therefore, the court will and does hereby order joint legal and physical custody to be exercised by both of these parents with regard to the two children that are the subjects of this lawsuit.

The chancellor then set forth a custody schedule that was intended to obviate the need for either party to pay child support.

¶23. On November 1, 2016, the chancellor entered his final judgment memorializing his bench ruling. The judgment also reflects that the chancellor "consider[ed] and balanc[ed] the factors set forth . . . in *Albright*" and determined that *"the parties are comparatively equal and neither party is favored over the other."*

¶24. In *Adoption of Wright v. Wright*, 160 So. 3d 737, 742-43 (¶16) (Miss. Ct. App. 2015), this Court followed the supreme court's prior holding in *Powell*, 792 So. 2d at 249 (¶33),[4] in determining that a chancellor erred by failing to make specific findings regarding each applicable *Albright* factor. This Court found that "the chancellor's opinion arguably

---

[4] In *Powell*, 792 So. 2d at 249 (¶33), the supreme court reversed the chancellor's judgment after finding that the chancellor failed to make specific findings for each *Albright* factor when making his custody determination.

10

discussed several of the *Albright* factors" but explained that "it did so unintentionally and did not address all of the factors applicable in this case." *Id*. at 742 (¶16). This Court then reversed the chancellor's judgment and remanded the case with instructions for "the chancellor to support his decision with an on-the-record *Albright* analysis." *Id*. at 743 (¶16).

¶25. However, in *Sobieske v. Preslar*, 755 So. 2d 410, 413 (¶12) (Miss. 2000), the supreme court affirmed the chancellor's judgment despite its determination that the chancellor failed to make any express findings as to the *Albright* factors. In *Sobieske*, the chancellor provided only the following language in his custody determination:

> Considering the factors set forth in *Albright*, it appears that both parents have the desire and capacity to have the primary custody of [the minor child], however, [the minor child] has close ties to the home she has lived in since birth as well as to her friends and family in Alcorn County, Mississippi. [The minor child] has close ties to Mrs. Sobieske's twin sister, Mary Allred, and to Ms. Allred's daughter, Meagan, who is approximately the same age as [the minor child]. [The minor child] also has, in Alcorn County, other family and friends who she is close to. Mrs. Sobieske and her new husband are living in Atlanta, Georgia, and since [the minor child] does not have any other family in that area, there are uncertainties for her there.

*Id*. at 411-12 (¶4). In *Sobieske*, the chancellor's ruling "appears to recognize that both parents are fit under *Albright*[.]" *Id*. at 412 (¶4). The supreme court held "it can be inferred from his citation to *Albright* that [the chancellor] felt that both parents were fit under *Albright*" but expressed that "it certainly would have been preferable for the [c]hancellor to have expressly considered each *Albright* factor[.]" *Id*. at 412, 413 (¶¶4, 12). However, the *Sobieski* Court explained that "it is perhaps understandable that [the chancellor] did not do so in the present case, given that the testimony established that both [parents] were fit and loving[.]" *Id*. at 412 (¶4). In affirming the chancellor's judgment, the *Sobieske* Court

11

recognized the deference that an appellate court "must show to the [c]hancellor in the exercise of his discretion." *Id*. at 413 (¶12).

¶26.    In the more recent case of *Huseth v. Huseth*, 135 So. 3d 846, 858 (¶36) (Miss. 2014), the supreme court again affirmed a chancellor's judgment awarding physical custody of the minor child to the mother despite finding that the chancellor failed to conduct a detailed, on-the-record analysis of the *Albright* factors.  The supreme court recognized that the chancellor "state[d] that she had weighed the [*Albright*] factors, . . . [plus] significant evidence was adduced by each party [that] was relevant to the *Albright* factors and the determination of custody." *Id*.  Finding its prior precedent in *Sobieske* controlling, the supreme court affirmed the chancellor's custody determination and held as follows:

> In light of the amount of evidence adduced at trial that was relevant to the *Albright* factors, the fact that each parent was shown to be a good parent, and the chancellor's indication that she had considered the factors by noting the stability achieved by the child's staying with his mother, we find that *Sobieske* is controlling, and consequently, we affirm the chancellor's custody determination.

*Id*. at 859 (¶39).[5]

¶27.    In the case before us, although the chancellor failed to provide an express, on-the-record determination regarding each *Albright* factor in his final judgment, the chancellor did state that in making his child-custody determination, he "consider[ed] and balanc[ed] the factors set forth by the Mississippi Supreme Court in *Albright*[.]"  The trial transcript also reflects that the chancellor explained that he "considered all of the evidence and testimony

---

[5] "The chancellor is only required to address those *Albright* factors that are applicable to the case before him." *Rayner v. Sims*, 228 So. 3d 353, 357 (¶12) (Miss. Ct. App. 2017).

in light of the enumerated *Albright* factors." However, the chancellor's ruling reflects only his determination that Robles and Gonzalez "are comparatively equal regarding those factors—or put another way, that neither party is favored over the other party in employing the *Albright* balancing test." Unlike *Sobieske*, the chancellor made no additional finding that both parties were loving and fit, and the record does not reflect on its face that both parents are loving and fit so as to support an award of joint custody. Therefore, we must remand this case to the chancellor to provide findings in accordance with *Albright* to support his custody determination.

¶28.    Additionally, when awarding joint custody, the supreme court has held that "unless the parents are capable of sharing joint custody cooperatively, it is incumbent upon a chancellor not to award joint custody." *Crider v. Crider*, 904 So. 2d 142, 147 (¶13) (Miss. 2005). The supreme court instructed that "[t]his is for the chancellor to determine as he or she is in the best position to evaluate the credibility, sincerity, capabilities[,] and intentions of the parties." *Id*. The chancellor failed to make on-the-record findings regarding his application of the various *Albright* factors and as to whether the parties were capable of cooperatively sharing joint custody. We cannot properly review the chancellor's child-custody determination without findings in support of his determination. Based upon the foregoing, we reverse the chancellor's judgment and remand the case to the chancellor for further proceedings consistent with this opinion.

¶29.    **REVERSED AND REMANDED.**

LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR. FAIR AND WILSON, JJ.,

13

**CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**