CHANDLER, J.,
for the Court:
¶ 1. The parties had a child together out of wedlock. After the mother expressed her intent to move from Lafayette County to the Mississippi Gulf Coast, the father petitioned the Lafayette County Chancery Court for a declaration of paternity and for custody of the child. Aggrieved that the chancellor awarded custody to the father, the mother appealed alleging that: (1) the chancellor manifestly erred by applying the law governing child custody in divorce cases rather than applying the law governing custody modifications; and (2) the chancellor erred in granting custody to the father because no material change in circumstances were shown. Finding no error, we affirm.
FACTS
¶ 2. The parties had a sexual relationship which led to the conception of their daughter. While pregnant, the mother moved out of the home she shared with the father to cohabit with a woman. A few hours after the birth of the parties’ daughter, the father visited the hospital and signed the child’s birth certificate.
¶ 3. During the child’s infancy and early childhood, the mother worked full time as an emergency room nurse. The father worked full time as a paramedic and also held public office. The parties worked opposite shifts, so while the mother was on duty the father cared for the child. The mother acknowledged that she and the father spent equal amounts of time with their daughter during the first four or five years of her life. The father voluntarily paid the mother $100 per month for child support and provided medical insurance for the child. This arrangement was never formalized in court.
¶ 4. In 1994, the mother moved into a house with a woman. The mother testified that she was a bisexual and admitted that her relationship with the woman was intimate. The mother testified that she and her partner did not hold hands or kiss in front of the child; however, the child had seen her mother and her mother’s partner share a bed. The mother had discussed her sexual preference with her daughter once, and she admitted that her daughter probably had an idea of the nature of her relationship with her partner. The mother agreed that the lesbian lifestyle was not generally accepted in today’s society and stated that she did not believe that her daughter should be raised as a lesbian.
¶ 5. When the child began attending school, she spent more time in her mother’s care than in her father’s. The parties agreed that their daughter would stay with her father every other weekend. The child also spent a lot of time with her father during the summer and accompanied him and his wife and stepchildren on family vacations. The child has presumably been living with the father since August 17, 1999, the date the custody decree was entered in the court below.
¶ 6. When the mother quit her full time job and expressed her intention to move to Gulfport to start a business, the father petitioned the chancery court for custody of the child. The mother had reduced her working hours from about 40 to 48 per week to approximately 16 per week. The mother testified that initially she would devote a lot of time to starting her business. She had no idea where she, her partner, and her child would live, and also did not know where her daughter would attend school. The mother admitted that a move to Gulfport was not in her daughter’s best interest.
*658 ¶ 7. After applying the factors delineated in Albright v. Albright, 437 So.2d 1003 (Miss.1983), the chancellor determined that the child’s best interests would be better served in her father’s custody. Since custody had never before been judicially determined, the chancellor treated the case as one for initial custody rather than one for modification of custody.
¶ 8. The chancellor held the parties equal on the following Albright factors: child’s age, parents’ age, child’s sex, child’s health, and emotional ties between the parents and the child. The chancellor noted that the child spent equal time with both parents until she started school. The chancellor acknowledged that the child lived with her mother once school started, but noted that the father spent ample time with her. While he did not specifically attribute the continuity of care factor to either party, it is clear that the chancellor considered the length of time that the child had spent under each parents’ care.
¶ 9. The chancellor ruled that the following factors were in the father’s favor: employment, financial stability, stability of environment, and moral fitness. He contrasted the father’s employment and financial stability to the mother’s. The father worked a full time job and earned $54,000 per year. His household income was more than $100,000. In contrast, the mother reduced her full time hours to part time which gave her enough money to pay her car payment and not much else. The father was financially stable; in contrast, the mother’s financial future was uncertain because she planned to move to Gulfport to start a business.
¶ 10. The chancellor also contrasted the stability of the environment that the father would provide to the environment that the mother would provide. He noted that the father would provide a five-bedroom home in which the child would enjoy a private bedroom. Further, the father was married and his wife and stepchildren, with whom the child had close relationships, lived in the home. Thus, the child would be in a stable, traditional, family setting. The chancellor further noted that Lafayette County was noted for its excellent public school system. In contrast, the mother had not yet found a place to live in Gulfport and did not know where the child would attend school. Further, the mother would initially spend a great amount of time in starting the business, time which would take away from the child’s care. The chancellor was moved by the mother’s admission that it was not in her daughter’s best interest to move away from Lafayette County where she had extensive extended family.
¶ 11. The chancellor noted that the mother had been married before and that a son had been born of that marital union. The mother relinquished custody of her son to her ex-husband because she did not feel that she was fit to be a parent. The mother explained that she is fit to be her daughter’s custodial parent because she, the mother, has grown up. The chancellor did not consider this explanation sufficient. The chancellor opined that the mother had “a very severe emotional problem.”
¶ 12. The chancellor commented on the mother’s lesbian lifestyle as it impacted the environmental stability of her home and also as it bore on her moral fitness. The chancellor noted that the mother had two live-in lovers since the child was born. The chancellor also stated that while a lesbian relationship is more acceptable today, it is not the norm. The chancellor acknowledged that he could not base his custody decision solely upon the mother’s sexual preference. It was, however, a factor in his decision.
*659 ANALYSIS
I. DID THE CHANCELLOR APPLY THE CORRECT LEGAL STANDARD?
¶ 13. The mother argues that the chancellor should have applied the legal standard used in determining custody modifications rather than the standard used to determine initial custody. Citing Law v. Page, 618 So.2d 96 (Miss.1993), the chancellor held that he was to treat the case as one for initial custody since custody of the child had never been judicially resolved. In Law v. Page, the father of an illegitimate infant boy petitioned the chancery court for a determination of paternity and for custody of the child. The child’s mother argued that the chancellor should have applied the standard of law used in custody modification cases and not the standard used in custody determinations incident to divorce. The court rejected the mother’s argument, holding:
The “material changes” standard used in modification proceedings is dependent on there being a prior determination of custody. Such is not the case here since there has been no prior custody determination. Therefore the proper standard of law to be applied is that found in divorce proceedings, which is the best interest of the child.
Id. at 101. The court further stated: “[I]n custody dealings involving an illegitimate child, when a father acknowledges the child as his own, the father is deemed on equal footing with the mother as to parental and custodial rights to the child.” Id. (citing Smith v. Watson, 425 So.2d 1030 (Miss.1983)).
¶ 14. The chancellor in the case sub judice properly decided the case as one for initial custody, and considered the factors delineated in Albright v. Albright, 437 So.2d 1003 (Miss.1983). This assignment of error is without merit.
II. DID THE CHANCELLOR ERR IN AWARDING CUSTODY TO THE FATHER?
¶ 15. This Court does not have the authority to reverse a chancellor’s custody determination unless the chancellor is manifestly wrong, clearly erroneous, or applies an erroneous legal standard. Weigand v. Houghton, 730 So.2d 581 (¶ 14) (Miss.1999). We have already held that the chancellor analyzed this case under the correct legal standard. We must now determine whether the chancellor’s custody determination was manifestly wrong or clearly erroneous. The mother expressed particular concern that the chancellor gave undue consideration to her impending move to Gulfport and to her homosexual lifestyle without finding that the child had been adversely affected. We find that the chancellor was not manifestly wrong and did not clearly err by awarding custody to the father for the following reasons.

A. The move

¶ 16. The mother argues that the chancellor placed undue emphasis on her impending move to Gulfport in awarding primary custody to the father. She cites case law in which the supreme court has held that moving to a different geographical location does not constitute a material change in circumstances. Citation to these cases is flawed because custody had never been judicially determined; thus, the chancellor was not required to find a material change in circumstances, or adverse impact upon the child, before he could consider the move in his custody determination.
¶ 17. Further, the supreme court has considered it a valid exercise of a chancellor’s discretion to consider that a child has more friends and relatives in a particular location when determining the custody of a *660 child. Sobieske v. Preslar, 755 So.2d 410, 413 (Miss.2000). In Sobieske, the parents held joint custody of the child. The mother remarried and was moving to Atlanta. As a result, the mother filed for primary custody and the father filed a counter-complaint. Id. The chancellor gave substantial weight to the move and the supreme court found no error.

B. Homosexuality

¶ 18. The mother also argues that the chancellor gave undue consideration to her bisexual lifestyle in awarding custody to the father. The dissent points out that under Mississippi law sexual relations of an unmarried custodial parent cannot be the sole factor in determination of custody absent a finding that the relationship caused harm to the child. Forsythe v. Akers, 768 So.2d 943 (Miss.Ct.App.2000). Quite so. But just as clearly and frequently the supreme court has stated that it can be one factor. See Sullivan v. Stringer, 736 So.2d 514, 517-18 (Miss.Ct.App.1999). “What we are left with is that the existence of the relationship is insufficient, but if the relationship is coupled with other conduct that indicates the custodial parent’s behavior is harmful in additional ways, custody can be changed.” Id. at (¶ 20). Of course, the present case is an initial custody determination, not a custody modification.
¶ 19. The particular issue of whether a chancellor may consider a parent’s homosexuality in making his custody determination has been considered by the Mississippi Supreme Court. In Weigand v. Houghton, 730 So.2d 581 (Miss.1999), the father petitioned the chancery court for modification of a child custody order changing physical custody of his son from his ex-wife. The impetus for the father’s petition stemmed from the son’s witnessing two acts of violence that his stepfather had inflicted upon his mother. The first occasion of violence resulted in the son’s stepfather’s conviction for simple assault. The second occasion resulted in the stepfather’s conviction for public drunkenness and malicious mischief. While the stepfather never abused the child physically, he threatened to kill the child during the second disturbance. The son then told his father that he wanted to live with him.
¶ 20. The chancellor analyzed, under Albnght, whether a change of custody was in the child’s best interest. He declined to remove the child from his mother’s custody. The chancellor seemed most concerned with the father’s moral fitness. The father is a homosexual involved in a monogamous relationship with his life-partner of eight years. While the child loved his father, he did not approve of his father’s lifestyle, and he expressed embarrassment when his father appeared in public with his partner. Noting that the morality of the father’s lifestyle was one important factor to consider, the chancellor stated that this was not the sole basis for his decision to leave custody with the mother.
¶ 21. The supreme court noted that the father’s moral fitness caused the greatest concern with the chancellor. However, the court stated that: “Although the morality of [the father’s] lifestyle was one important factor to consider in the eyes of the chancellor, this was not the sole basis for his custody decision.” Id. at (¶ 22). The court affirmed the chancellor’s custody finding, stating: “On this record, this Court cannot say that the chancellor was manifestly wrong in denying [the father’s] petition for modification to change child custody....” Id. at (¶ 24).
¶ 22. The Weigand court clearly condoned the chancellor’s consideration of the father’s homosexuality in considering his fitness to be a custodial parent, but care *661 fully noted that this was not the sole basis for the chancellor’s decision. Like the chancellor in Weigand, the chancellor in the present case was greatly concerned with the mother’s bisexual lifestyle; however, this was not the sole basis for his decision.
¶ 23. In White v. Thompson, 569 So.2d 1181 (Miss.1990), the court considered a case in which custody was awarded to the child’s grandparents and not to the lesbian mother. The mother argued that her lesbian conduct was not shown to have had any detrimental effect on her children. The supreme court, however, affirmed the custody award. The court stated:
Though the predominant issue in this case seems to have been [the mother’s] lesbian relationship, and the chancellor may have relied almost entirely on this, we find that a review of the entire record and the circumstances present, including the children’s health and supervision and the atmosphere in which they were being brought up shows that the chancellor’s decision that [the mother] was an unfit mother, morally and otherwise, was not against the overwhelming weight of the evidence.
Id. at 1184.
¶ 24. The White case demonstrates that even though the mother’s lesbian lifestyle seemed to be the predominate issue in the chancellor’s mind, this Court is not at liberty to reverse if the other Albright factors support an award to the non-homosexual parent.
¶ 25. The dissent believes that the homosexuality of a parent should not be a factor in custody determinations. It cites a long list of cases from other jurisdictions that it apparently believes reflects the more thoughtful view of the irrelevance of homosexual relations when determining custody of a child. We note that the list was taken from the dissent in White v. Thompson, 569 So.2d at 1185-86. Most of these cases uphold our view that homosexuality can be one but not the sole basis for child custody. We have found no case law that states homosexuality or the sexual behavior of a parent must' be ignored.
¶ 26. In the present case, in addition to the mother’s bisexual lifestyle, the chancellor was disturbed at the mother’s lack of financial and emotional stability. He was extremely concerned that the mother quit a well-paying full time job to move to Gulfport to start a business. The chancellor was most impressed with the father’s ability to provide a stable environment for his daughter in the form of an established home in which she would have her own bedroom and would be living in a traditional family environment. As in Weigand and Thompson, although the morality of the mother’s lifestyle was one important factor to the chancellor’s decision, it was not the sole factor; thus, there was no clear error and the chancellor did not abuse his discretion in awarding custody to the father.
¶ 27. THE JUDGMENT OF THE LAFAYETTE COUNTY CHANCERY COURT GRANTING CUSTODY OF THE CHILD TO APPELLEE IS AFFIRMED. COSTS OF THE APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., SOUTHWICK, P.J., PAYNE, BRIDGES, LEE, IRVING and MYERS, JJ., concur.
PAYNE, J., concurs with separate written opinion joined by SOUTHWICK, P.J.
THOMAS, J., dissents with separate written opinion joined by KING, P.J.