# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00611-COA

**HEATHER HENDRIX**                                                           **APPELLANT**

**v.**

**JACOB WHITT**                                                                   **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/27/2021 |
| TRIAL JUDGE: | HON. D. NEIL HARRIS SR. |
| COURT FROM WHICH APPEALED: | GEORGE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | CAMERON MATTHEW McCORMICK |
| ATTORNEYS FOR APPELLEE: | MATTHEW STEPHEN LOTT |
| | WILLIAM BRYAN BEDWELL |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND REMANDED - 10/31/2023 |
| MOTION FOR REHEARING FILED: | |

### BEFORE BARNES, C.J., McDONALD AND SMITH, JJ.

### McDONALD, J., FOR THE COURT:

¶1.     Heather Hendrix appeals from the George County Chancery Court's judgment granting custody of her minor child, TCW, to the child's father, Jacob Whitt.[1]  Hendrix contends that the chancery court erred by failing to determine the best interest of the child according to the *Albright*[2] factors and by treating the case as one of custody modification instead of an initial determination of custody.  After a review of the record and the arguments of counsel, we reverse the chancery court's judgment and remand for further proceedings consistent with this opinion.

---

[1]  For privacy purposes, we use initials for the minor child's name.

[2]  *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

## Facts

¶2.     Hendrix and Whitt lived together off and on between 2013 and 2019.  They never married, but together they had one child, TCW.  After they separated, the parties managed to share custody of TCW while the child was very young.  But when TCW reached school age, Whitt sought a court order giving him custody, and the chancery court was positioned to decide what was best for the child.

¶3.     The parties' relationship began in 2013 when Whitt moved in with Hendrix and her parents in Baton Rouge, Louisiana.  Whitt worked as a welder, and Hendrix worked as a waitress at Red Lobster.  According to Whitt, when the restaurant cut her hours, Hendrix quit.  She worked briefly at a hotel as a cleaning lady, but that job was short-lived.

¶4.     Sometime in 2015, the couple moved to Gulfport, Mississippi, where Hendrix worked briefly for a trucking company and then became pregnant.  When TCW was born in September 2015, Whitt signed the birth certificate, acknowledging that he was the child's father.  Hendrix experienced medical complications before and after TCW's birth.  During the pregnancy, she developed preeclampsia, and then after the birth, fluid built up around her heart.  She underwent gallbladder surgery and remained in the hospital for two extra weeks.  According to her, these complications led to her having a tubal ligation.

¶5.     In addition to these physical medical problems, Hendrix suffered from post-partum depression, which Whitt said lasted for years.  Hendrix admitted her struggles, and Whitt's parents helped by taking TCW to live with them for several months shortly after the child's birth.  Whitt said that this began a pattern of the child staying with his parents for extended

2

lengths of time and then staying with him and/or Hendrix for other periods. In 2016, the three of them lived with Whitt's parents in Lucedale, Mississippi, for a while, but then Hendrix left to live with her mother in Baton Rouge. According to Whitt, Hendrix later had an altercation with her mother and moved to Gulfport. Afterward, Hendrix took TCW and moved to South Carolina for a few months. Whitt said he sometimes would go visit TCW there, and at other times, he brought TCW back to Mississippi to stay with him at his parents' home. By the end of the year, Hendrix and the child finally returned to live in Mississippi with Whitt and his parents.

¶6. In 2017, Whitt moved to Tennessee for work, and Hendrix and TCW joined him. A year later, in 2018, they moved to Baton Rouge, where Whitt found an out-of-state job that required him to be gone for twenty-eight days at a time. Whitt said that during this time, TCW would periodically stay with his parents, then sometimes with Hendrix, and at other times with Hendrix's mother. But Whitt said that because he did not like leaving his child for so long, he found another job so he could be home every night.

¶7. During these years, Whitt contended that he was TCW's primary caregiver even though Hendrix did help him. To support his claim, Whitt presented a reconstructed calendar that he and his mother had prepared to show the dates and times that TCW had been in Whitt's or his parents' custody, going back to September 2015. Whitt also said that when he would bring the child back from staying at his parents' home, Hendrix wanted to keep TCW only for a short time before she said she could not handle him. Whitt said Hendrix never objected to his taking the child to stay with his parents, and this back-and-forth pattern

3

continued even when Whitt and Hendrix moved to Tennessee for a year. Whitt said that TCW would have to stay with his parents for one to two weeks at a time because Hendrix would get overwhelmed or because she was recuperating from a medical problem. Hendrix confirmed that since the tubal ligation, she experienced continuing medical complications that ultimately resulted in her having a hysterectomy in February 2018. She said that these medical issues affected her ability to care for TCW for a time because, for example, after surgery, she was limited to lifting no more than ten pounds.

¶8.    Hendrix disagreed with Whitt's characterization of her care for the child when she was not limited by her medical conditions. Although Hendrix admitted that she needed help when she suffered from post-partum depression, she said she did not get help from Whitt. She stated that when the child was a baby, the child's room had a full-size bed where she slept so she could get up and tend to TCW. This arrangement enabled Whitt to sleep alone in their bedroom so he could be rested when he got up for work. Hendrix contended that she was the one who changed the child's diapers, bathed him, and fed him. She said that Whitt never cared for TCW without assistance from either her or his parents. Hendrix testified that she taught TCW the alphabet and shapes and that by the time the child was two, TCW could count to thirty. However, Hendrix admitted that Whitt was a very involved father and that Whitt's parents, who kept the child for weeks on end, were also a part of the child's life.

¶9.    In 2019, when they were still living in Baton Rouge, Hendrix's parents bought a bar and pool hall. Whitt said Hendrix started going to the pool hall two to three times a week and staying until midnight. He said that he would be home taking care of TCW if the child

4

was not with his parents. Hendrix countered that when her parents bought the bar, she worked as a bartender's assistant on weekends. She said she would go to the bar one other night during the week and play pool from 7 p.m. to 11 p.m. But she said Whitt often went with her when TCW was staying with Whitt's parents.

¶10. Whitt and Hendrix finally separated in May 2019. Initially Whitt moved into his own apartment in Baton Rouge, but then in July 2019, he moved back to Lucedale, Mississippi, to live with his parents. Whitt said that he took TCW with him and the child stayed with him and his parents until mid-August. TCW then returned to Louisiana to live with Hendrix and he started attending daycare, which Whitt paid for. At this point, Hendrix was living with her parents.

*Pre-litigation Custody Agreement*

¶11. In the fall of 2019, the parties signed an agreement that Hendrix drafted concerning TCW's custody. Whitt said this agreement came about because his truck broke down and he asked Hendrix for the car he was paying for and had let her use. According to Whitt, when he asked for the vehicle, Hendrix became angry. Hendrix told him that in order for him to "get everything," meaning his car, his TV, and his computer, he would need to sign an agreement concerning TCW. According to Whitt, Hendrix told him that if he did not sign the agreement, she would keep TCW and he would have to take her to court if he wanted custody. Whitt said that he signed the agreement because it gave him custody of TCW, which is what he really wanted.

¶12. Although she admitted that she told Whitt he had to sign the agreement or she would

5

keep TCW and Whitt would have to go to court, Hendrix said she drafted the agreement because she was starting school, and she wanted something in writing concerning TCW's custody. Hendrix said that on her school days, she would have to get up at 4:30 in the morning and would not get home until 6:00 p.m. Because she would be in school Wednesdays through Saturdays, Hendrix said Whitt would have the child. She would have TCW on the other days. However, the agreement only provided that each parent would have the child on "specified days" without identifying the particular days. Significantly, the agreement specifically stated that Whitt would be the child's "primary custodian." Hendrix understood that per this agreement, TCW would be in Mississippi most of the week. *The agreement was set to end in September 2020 when Hendrix graduated.*

¶13. Despite the terms of the agreement, Whitt said that TCW pretty much lived with him and his parents thereafter. Whitt said he would take TCW to visit Hendrix on weekends when she asked. At that point, Hendrix was living with her parents. Whitt testified that sometimes the child would stay the weekend; other times Hendrix only wanted to visit for a few hours. After the visit, Whitt would drive the child back with him to his parents' home in Lucedale.

¶14. Between December 2019 and March 2020, Whitt worked out-of-state in Pennsylvania. He testified that when he came home at Christmas, he took TCW to visit Hendrix. He then returned to work and learned that after Christmas Hendrix's parents had made her leave their home. Whitt stated that afterward, Hendrix saw the child only once in February for a few hours. Although Hendrix had some video chats with the child, to Whitt's knowledge, she

6

did not often ask to see the child. Hendrix disagreed and said that Whitt's parents brought the child to visit Hendrix in Baton Rouge once but that they often refused her requests for video chats.[3]

¶15. In March 2020, Whitt's job sent him home because of COVID-19. Although Hendrix asked him to take TCW to visit her in Baton Rouge, she would not tell Whitt where she was living. In addition, according to Whitt, at that time Louisiana was a hotbed for COVID-19. Whitt said his father had COPD, and Whitt did not want him to get infected if TCW was exposed to the virus. Hendrix admitted that she did not tell Whitt her address. But she said that if Whitt brought TCW to visit, then she would tell Whitt the address, and he could see where she was living. Whitt said that her refusal to give him her address prompted him to file the custody matter in court.

*Complaint for Custody and Paternity*

¶16. On April 22, 2020, Whitt filed a petition to establish paternity, custody, and other relief in the George County Chancery Court. In the complaint, among other things, Whitt sought an adjudication of his paternity of TCW, as well as physical custody of the child and child support. He also requested temporary custody while the matter was pending. On May 22, 2020, Whitt filed an amended complaint and a "Motion for Rule 65 Ex Parte Relief." In his motion, Whitt alleged that Hendrix lived in Louisiana but that her exact whereabouts were unknown. He stated that Hendrix's mother would not disclose her whereabouts.

_____

[3] At trial in August 2021, Hendrix said that between "February and July," she asked almost weekly to come to Lucedale to visit, but she was refused, even on Mother's Day. She was told that the reason was the danger from the pandemic. It is unclear, however, whether her requests were made before or after the court became involved in July 2020.

Moreover, Whitt alleged that Hendrix's behavior had been increasingly erratic, that she had not held a steady job, and that she had frequently moved. Whitt said the child had shown signs of fear about going with Hendrix when she did show up for visitation. Whitt attached a return from a process server who attempted to serve Hendrix at her last known work address and was told that she no longer worked there. The process server also went to Hendrix's last known address and was told by the resident there that he had lived at that address for a year and did not know anyone named Hendrix. Whitt also attached a text-message exchange with Hendrix in which she refused to give him her address.

*Temporary Hearings and Orders*

¶17.   On July 7, 2020, the chancery court issued an ex parte order giving temporary custody to Whitt's mother, Dorothy. *See* M.R.C.P. 65. The court appointed a guardian ad litem (GAL) to investigate and make recommendations to the court regarding the best interest of the minor child. Whitt was ordered to pay $1,000 for the GAL's services. The court further ordered Hendrix could not go within 2,500 feet of Whitt, his work, the child, or the child's school and scheduled a hearing on the matter for July 10, 2020.

¶18.   On July 10, 2020, Hendrix appeared in court for the temporary hearing along with Whitt, Whitt's attorney, and Whitt's mother. The GAL told the court that she had met with both parties, and they had agreed to terms for a temporary order. The court addressed Hendrix and Whitt and determined that each had the capacity to sign the temporary order presented and did voluntarily agree to the terms of the order. The GAL confirmed that the order, signed by both Whitt and Hendrix, was in the best interest of the minor child, and the

parties told the court they were satisfied with the GAL's services. The chancery court entered the temporary order, awarding temporary physical custody of TCW to Whitt. The court granted Hendrix visitation but did not require her to pay child support. Hendrix expressly told the court that she agreed with the terms of the order. The court relieved the GAL of her duties[4] and set the matter for trial on December 9, 2020.

¶19. On November 17, 2020, the parties moved for more specific visitation over Thanksgiving and Christmas. The court granted the motion and entered an agreed order specifying visitation of the parties.

¶20. By agreement of the parties, the trial on the matter was continued four times from its original date of December 9, 2020, to February 10, 2021; to April 19, 2021; to June 21, 2021; and finally to August 10, 2021. The last order of continuance contained a provision that neither party was to use corporal punishment on the child and that the child was to be properly supervised at all times.[5] During this time, both parties married other people. Whitt married his wife on June 11, 2021; Hendrix married her husband, Blake, in July of 2021.

*Trial*

¶21. At the trial held on August 10, 2021, only Whitt and Hendrix testified. They reviewed their history as a couple, which is detailed above. Whitt testified that he currently lived with his parents, his wife, and TCW and that he had been working as a welder with McAbee

---

[4] The GAL did not prepare any written report. The only evidence of her opinion was her statement to the court that the parties had agreed on a temporary order which the GAL felt served the best interest of the child.

[5] The provision concerning corporal punishment arose because TCW accused Hendrix's father of spanking him. Hendrix claimed that TCW lied.

Construction Company for about a year. He worked forty hours a week from 6:20 a.m. to 2:50 p.m. and was home by 4 p.m. each day. He said this job was stable, and he planned to work there for a long time. Whitt reviewed the information on his Rule 8.05 financial statement, UCCR 8.05, confirming a take-home salary of $4,202 per month net. He said that although they currently lived with his parents, he and his wife planned to build a home of their own in the future.

¶22. Hendrix said that she and her husband, Blake, lived in Gonzales, Louisiana. She was the manager of a children's hair salon where she worked from 9:30 a.m. until they closed at 6 p.m. She told the court that if she were granted custody of TCW, she would adjust her hours to be able to pick him up from school. Her husband worked for a company installing internet. They have a home where TCW has his own room, which is decorated with an Avenger's theme. Hendrix confirmed that her monthly income, as shown on her Rule 8.05 financial statement, was $3,035 gross, and $2,620 net. She did not include her husband's income, although she testified that she had access to it if needed. Basically, both Hendrix and Whitt were financially stable.

¶23. At the time of the trial, TCW was nearly six years old and in kindergarten. Whitt testified that TCW had bonded with his wife, but he, not she, disciplined the child. Whitt also acknowledged that TCW also had a good relationship with Hendrix's husband. The child's school records, which were entered into evidence, contained many positive comments, such as "follows directions" and "uses good manners at lunch," and TCW was "respectful toward others." No concerns were noted by his teacher.

¶24. On the other hand, Hendrix testified that although TCW was physically healthy, the child suffered from anxiety. She explained that since the court proceedings began, she had observed the child crying and unable to catch his breath. TCW had tantrums and also had been lying to both her and Whitt. During her summer visitation, Hendrix said she took TCW to see a therapist at Ochsner Health System in Baton Rouge. Although the therapist diagnosed the child with anxiety, the child did not need medication, and Hendrix did not indicate that the child needed any treatment.[6] Hendrix also told the court that her past medical issues had been resolved and that she was in good physical and mental health.

¶25. Whitt told the court that he wanted custody because TCW has spent the majority of his life with him in his parents' home in Lucedale, and that is "the only place he's really truly known." On the other hand, Hendrix described the child as being her "world." She said that all she ever wanted to be was a mom and she would do anything for her child. When TCW visits, Hendrix said that he runs and hugs her, and does not want to leave when the visitation is over. When she does not have him, she talks to the child at least three times a week, either by Facetime or by video chat. Although she acknowledged that Whitt was a very involved father, as were his parents, she also told the court that TCW is the only child she will ever have.

¶26. Throughout their testimony, the court asked both Whitt and Hendrix clarifying questions. The court specifically questioned Hendrix about the 2019 custody agreement she had written:

---

[6] No medical records of the child were entered into evidence.

THE COURT: [W]hy did you write up this agreement?

THE WITNESS: Why did I write it up? That's what I was trying to explain earlier. They had tried to take him once before during my depression and that's when I took him to South Carolina. So I thought if I wrote the agreement up, they couldn't do that again. I thought I was covering myself.

THE COURT: But you were the one that wrote . . . ["]primary physical custody?["]

THE WITNESS: I am. I didn't understand.

THE COURT: You didn't understand what that means?

THE WITNESS: I looked at like four days there and three days with me that would leave him primarily there. So that was my mistake.

THE COURT: You understand the word "physical?"

THE WITNESS: Like, he would be there physically.

THE COURT: Do you understand the word "custody?"

THE WITNESS: Yes, sir.

¶27. The court then asked Hendrix about the July 10, 2020 agreed court order that she signed. She said that the only reason she signed it was because the court told her she could see her child that day. The court clarified, and Hendrix agreed, that the court never conditioned visitation with her child on Hendrix agreeing to the terms of the temporary order. Hendrix confirmed that it was her choice to sign the temporary order.

*Final Judgment*

¶28. On September 27, 2021, the chancery court entered a final judgment on the matter. The court found *Quadrini v. Quadrini*, 964 So. 2d 576 (Miss. Ct. App. 2007), helpful in determining the impact of the parties' pre-litigation custody agreement. The court reasoned

that if the agreement had been court-ordered, under *Quadrini*, it would now be considered a permanent order given the passage of time. The court found that both parents could care for the child, but that since birth Whitt and his parents have been the primary caregivers. The court further found that it was in the child's best interest that the parties' written agreement be followed even though no court order existed prior to the current action. The court determined that the "[t]emporary agreement of the parties should become a permanent one" and awarded TCW's custody to Whitt and visitation to Hendrix.[7] Hendrix was ordered to pay $250.00 per month in child support until the child reaches the age of twenty-one or is emancipated by court order. The parties were ordered to split the cost of medical insurance and any medical expenses not covered by insurance.

*Rule 59 Motion, Hearing, and Order*

¶29. On October 4, 2021, Hendrix filed a motion for a new trial, to alter or amend judgment, or for reconsideration. In it, Hendrix argued that the court failed to make findings on each *Albright* factor to determine the child's best interest,[8] and that the court should reconsider the matter and issue specific findings on those factors. Whitt responded that Hendrix had failed to specify what was factually erroneous in the court's judgment. Whitt cited cases where the appellate court had affirmed an *Albright* analysis where a chancellor

---

[7] Attached to the final judgment was a schedule detailing Hendrix's visitation rights, including every other weekend, certain three-day weekends, summer visitation, Thanksgiving, and Christmas.

[8] In *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983), the Mississippi Supreme Court delineated the factors for a court to use in determining the best interest of the child in custody matters.

13

had failed to label each *Albright* factor. In addition, Whitt argued that the law requires that the court only address the *Albright* factors that are applicable to a case. Whitt examined various rulings in the chancery court's judgment to show how the court had addressed each *Albright* factor that was relevant to the case.

¶30. The chancery court heard arguments on Hendrix's motion for reconsideration on May 16, 2022. The court expressed the difficulty it had in reaching a decision because, among other things, both parties were "good people." On May 19, 2022, the court entered a judgment denying the motion to reconsider. In the judgment, the chancery court also clarified the years that each party could claim TCW on their tax returns.

*Appeal*

¶31. On June 20, 2022, Hendrix filed her notice of appeal. She argues that the chancery court erred by failing to analyze the evidence according to the *Albright* factors and by applying *Quadrini*, a modification case, when making an initial custody determination.

**Standard of Review**

¶32.    In custody cases, we are bound by the limits of our standard of review and may reverse only when the decision of the trial court was manifestly wrong or clearly erroneous, or an erroneous legal standard was employed. *Wright v. Stanley*, 700 So. 2d 274, 280 (Miss.1997); *Williams v. Williams*, 656 So. 2d 325, 330 (Miss. 1995). Our standard of review in child custody cases is very narrow. Like the chancellor, our polestar consideration must be the best interest of the child. However, it is not our role to substitute our judgment for his.

*Hensarling v. Hensarling*, 824 So. 2d 583, 586-87 (¶8) (Miss. 2002). "Where the chancellor has applied the correct legal standard, and makes finding of facts, which are supported by substantial evidence, this Court will not reverse his decision." *Sturgis v. Sturgis*, 792 So. 2d

14

1020, 1023 (¶12) (Miss. Ct. App. 2001). All questions of law are reviewed de novo. *Townsend v. Townsend*, 859 So. 2d 370, 372 (¶7) (Miss. 2003).

**Discussion**

¶33. "The relationship of parent and child is not for the benefit of the parent but for the child." Matthew Thompson, Mississippi Divorce, Alimony & Child Custody § 14.2 (2018). Therefore, "[i]t is well established that the best interest of the child is paramount in any child-custody case." *Latham v. Latham*, 357 So. 3d 1157, 1161 (¶8) (Miss. Ct. App. 2023) (citing *Roberts v. Eads*, 235 So. 3d 1425, 1428 (¶12) (Miss. Ct. App. 2017)). In original determinations of the custody of a minor child, the child's best interest and welfare is the "polestar consideration," and the court is to determine what is in the best interest of the child using the *Albright* factors. *Romans v. Fulgham*, 939 So. 2d 849, 851-52 (¶¶3-4) (Miss. Ct. App. 2006). These factors include:

> (1) the child's age, health, and sex; (2) the parent with the continuity of care prior to the separation; (3) the parent with the best parenting skills and the willingness and capacity to provide primary child care; (4) the parents' employment and the responsibilities of that employment; (5) the parents' physical and mental health and age; (6) the emotional ties of the parent and child; (7) the parents' moral fitness; (8) the child's home, school, and community record; (9) the child's preference at the age sufficient to express a preference by law; (10) the stability of the parents' home environments and employment; and (11) other factors relevant to the parent-child relationship.

*Id*. (citing *Albright*, 437 So. 2d at 1005).

¶34. Although "[a]n *Albright* analysis is not a mathematical equation," and "all the *Albright* factors are important, the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Latham*, 357 So. 3d at 1161 (¶9) (quoting *Hall v. Hall*, 134 So. 3d 822, 827

15

(¶19) (Miss. Ct. App. 2014)). But "a determination of child custody will be held erroneous where a chancellor is not thorough in his discussion" of the *Albright* factors. *Robles v. Gonzalez*, 246 So. 3d 945, 950 (¶21) (Miss. Ct. App. 2018) (quoting *Powell v. Ayars*, 792 So. 2d 240, 249 (¶33) (Miss. 2001)).

¶35.    In proceedings for a modification of an existing custody order, the party seeking a change carries a heavier burden of proof. *Id*. Before proving that a change in custody serves the best interest of the child, a party must first show a material change in the circumstances of the parties has occurred and that the change has adversely affected the child or children. *Mabus v. Mabus*, 847 So. 2d 815, 818 (¶8) (Miss. 2003) ("In the ordinary modification proceeding, the non-custodial party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interests mandate a change of custody."). We recently summarized the burden of proof required in custody modification actions and the analysis that a chancery court undertakes in determining whether a custody change should be made in *Culver v. Culver*, No. 2021-CA-01108-COA, 2023 WL 3594128, at *2 (¶7) (Miss. Ct. App. May 23, 2023). There, we stated:

> In order to modify a child-custody order, the party seeking the change in custody bears the initial burden of proving that there has been a material change in circumstances. *Anderson v. Anderson*, 961 So. 2d 55, 58 (¶6) (Miss. Ct. App. 2007). In determining whether a material change in circumstances has occurred, the chancellor must examine the totality of the circumstances. *Id*. If the chancellor finds that a material change has occurred, the chancellor must then make a separate assessment to determine if the change is "adverse to the child's welfare." *Id*. (citing *Thompson v. Thompson*, 799 So. 2d 919, 922 (¶8) (Miss. Ct. App. 2001)). In the event of an adverse material change in circumstances, "the chancellor may determine whether the best interest of

16

the child requires a change in custody." *Id*. When analyzing the best interest of the child for the purposes of custody modification, the chancellor must make "on-the-record findings for each of the *Albright* factors." *Anderson*, 961 So. 2d at 58 (¶6) (citing *Sturgis v. Sturgis*, 792 So. 2d 1020, 1025 (¶21) (Miss. Ct. App. 2001)).

*Id.* Thus, the burden of proof for parties seeking custody differs depending on whether a case involves an initial determination of custody or the modification of an existing custody order.

¶36.    The lines become blurred when the case involves a temporary order entered by the court giving custody to one party while the proceedings are pending.  In such cases, the chancery court must examine the effect of the temporary order and determine the nature of the case and the burden of proof that the non-custodial parent then has.  For example, in *Thompson*, 799 So. 2d at 921 (¶3), the parties were divorced in February 1993, and the wife was awarded custody of the children.  In November 1994, the husband filed a petition to modify custody.  *Id*. at (¶4).  After a court-appointed expert opined that the wife suffered from severe depression and post-traumatic stress disorder, the court entered a temporary order in May 1995 giving the husband custody.  *Id*. at (¶5).  When the matter was finally heard in 1999, the chancery court held that the wife had shown no material change in circumstances since the 1995 temporary order and, using the *Albright* factors, determined that the father should be given custody.  *Id*. at 922 (¶11).  On appeal, we affirmed the chancery court's ruling that the wife who sought a change in the provisions of the temporary custody order, which had been in place for over three years, had to prove the elements needed in modification cases because the temporary order "had acquired incidents of permanency." *Id*. at 926-27 (¶30).

17

¶37. Similarly, in *Swartzfager v. Derrick*, 942 So. 2d 255, 258-59 (¶12) (Miss. Ct. App. 2006), we affirmed the chancery court's ruling that the non-custodial parent under a temporary order had the burden of proving a material change in circumstances since the entry of the temporary order rather than the party who originally sought modification of the divorce decree. In that case, the husband filed an action to modify the custody provisions in the parties' divorce decree that had given custody of the child to the wife. *Id*. at 256 (¶4). The parties later agreed to a temporary order that changed custody to the husband. *Id*. at (¶5). Three years later, when the chancery court heard the matter, it found that the temporary order "had assumed the nature of a permanent order," and the court required the wife to prove that since the date of that order, a material change had occurred that adversely affected the child. *Id*. at 257 (¶6). On appeal, this Court affirmed the chancellor's characterization of the temporary order and its imposition of the burden of proof for modification on the wife. *Id*. at (¶9).

¶38. We also considered a temporary order to have become a final order for purposes of altering the burden of proof in *Quadrini*, which the chancery court found controlling in this case. In *Quadrini*, the parties agreed to an irreconcilable differences divorce, but submitted several issues to the chancery court for determination, including the custody of their children. *Quadrini*, 964 So. 2d at 577 (¶2). The court conducted a full evidentiary hearing and analyzed the evidence applying *Albright* factors. *Id*. However, the court did not enter a final judgment adjudicating custody because the parties' lives were in significant transition. *Id.* The court noted that the husband had a taxing workload with his restaurant business and

18

relied heavily on babysitters, while at the time of the divorce, the wife was living with a person with whom she had an extra-marital affair. *Id.* at (¶3). The court felt that it would be premature to determine permanent custody and entered a temporary custody order in September 2003. *Id.* at (¶2). The court awarded the parties joint legal and physical custody but allowed the children to reside with the mother during the school year and with the father for the majority of the summer. *Id.* The court retained jurisdiction to modify the custody award and held that if either party should seek a modification of the temporary order, he or she would not have to show that material change in circumstances adversely affected the best interest of the children. *Id.*

¶39. Eight months later, the parties filed motions for contempt against each other concerning visitation, but neither raised the issue of modifying custody. *Id.* at 578 (¶4). The court ruled on these motions concerning visitation. *Id.* Two years after the initial temporary order, the husband filed a motion for modification of custody, alleging that the wife did not have a permanent and stable home life and the children were not enrolled in school. *Id.* at (¶5). When the court heard the matter in October, the wife presented evidence that, among other things, she had been displaced by Hurricane Katrina. *Id.* at (¶6). The court denied the motion for modification. *Id.* at 579 (¶8). Although the court stated that had the husband been in his current situation at the time of the divorce, the court would have awarded him custody, the court found that the wife's current situation was temporary and would improve. *Id.* The court concluded that under the standard of reviewing a custody agreement, i.e., whether a material change in circumstances has adversely affected the children and that a

19

change in custody was in the children's best interest, the court concluded it could not modify the custody arrangement. *Id.* Although the wife had experienced a material change in circumstances that adversely affected the children, the chancellor found that the best interests of the children did not require a change in custody using the *Albright* factors. *Id*. at 581 (¶21). The husband appealed. *Id*. at (¶9). So did the wife, challenging the jurisdiction of the appellate court and arguing that the custody order was not a final, but a temporary order. *Id.* at (¶10).

¶40. On appeal, we held that the chancery court had jurisdiction to consider the appeal because the September 2003 temporary order had become a permanent custody order that the husband sought to modify. *Id.* at 581 (¶19). We stated, "[T]emporary orders that acquire incidents of permanency become permanent orders for the purpose of assigning the burden of proof in child custody modification cases." *Id.* at 580 (¶17). Citing *Swartzfager* and *Thompson*, we stated:

> In both cases, this Court held that the passage of time—four years in *Thompson* and almost three years in *Swartzfager*—was sufficient to provide the temporary orders with "incidents of permanency," thereby creating a permanent order of the temporary order and shifting the burden of proof to the non-custodial parent to demonstrate a need for a change in custody by a showing of a material change in circumstances adversely affecting the child.

*Quadrini*, 964 So. 2d at 580 (¶17). We then proceeded to hold that the chancery court had not erred by failing to grant custody to the husband. *Id*. at 582 (¶22).

### I. Whether *Quadrini* applies in this case.

¶41. In this case, the chancery court found that the parties' October 2019 custody agreement should be considered permanent under the reasoning of *Quadrini* and awarded

20

custody to Whitt. After reviewing the facts and proceedings in this case, we disagree for several reasons.

¶42.    First, *Quadrini* and its precedent, *Thompson* and *Swartzfager*, involved temporary *orders* that were entered *after* an initial *court* order determining custody had been made, not a personal agreement between the parties. In *Swartzfager*, the parties had agreed on a permanent custody arrangement in their separation agreement, which the court incorporated into its decree granting an irreconcilable differences divorce. *Swartzfager*, 942 So. 2d at 256 (¶5). In *Thompson*, the chancery court entered a temporary order after it considered the court-appointed expert's report that the mother was suffering from a mental condition. *Thompson*, 799 So. 2d at 922 (¶¶4-5). The chancery court in *Quadrini* issued its temporary custody order after hearing testimony and assessing the *Albright* factors. *Quadrini*, 964 So. 2d at 577 (¶2). None of these cases involved the enforcement of a mere private *agreement* of the parties prior to litigation, which the chancery court in this case considered "permanent" and enforceable.

¶43.    Moreover, the July 2020 temporary order in this case did not acquire the incidence of permanency either. The chancery court issued the July 10, 2020 temporary order but heard no testimony concerning the relative fitness of the parties and made no assessment under *Albright* as did the court in *Quadrini*. In addition, there is nothing in the record reflecting that Whitt and Hendrix intended their agreed temporary order would become  permanent.

¶44.    Second, in *Quadrini*, *Thompson*, and *Swartzfager*, the temporary orders had been in place for three years or more, much longer than the thirteen months the temporary order in

21

this case was in effect before trial. We hesitate to shorten the length of time that a temporary order may be in place before it can be considered permanent, especially in this case where the delay in proceeding to a final judgment was not caused by either party. In *Swartzfager*, although the wife filed a contempt action several months after the temporary order was entered, she did not challenge custody until nearly two and one-half years later. *Swartzfager*, 942 So. 2d at 256 (¶5). Here, the temporary order was entered on July 10, 2020, and the final hearing was held in August 2021, just thirteen months later. Hendrix filed no intervening petitions and did not appear in court on any other matter in the interim. Although the case was continued, it was only rescheduled for a few months each time.[9] Nor should the date of the parties' informal agreement (in October 2019) be used to calculate the time period for *Quadrini* to apply. As previously noted, the private agreement was not a formal adjudication of custody, and the parties clearly intended it to be temporary, ending in September 2020 when Hendrix graduated.

¶45.    In this case, the record reflects that the temporary order was merely an interim order in an original custody proceeding where no prior determination of the child's best interest had ever been made. The case is more procedurally akin to *S.B. v. L.W.*, 793 So. 2d 656 (Miss. Ct. App. 2001), where we held that a father's petition for paternity and custody was an initial custody determination because custody of the child had not been previously determined. *Id.* at 659 (¶13). In that case, the parties were not married and the father signed

---

[9] We note that this case was pending during the height of the COVID-19 pandemic, which caused delays for many cases in our courts.

22

the child's birth certificate when the child was born. *Id.* at 657 (¶2). The child lived with the mother for several years, even after the child started school. *Id*. at (¶¶3-4). The father then sought custody, which the chancery court granted, after assessing the *Albright* factors. *Id.* at 657-58 (¶¶1, 7-12). On appeal, the mother argued that the chancery court should have used the legal standard for custody modification cases rather than the standard used for initial custody determinations. *Id.* at 659 (¶13). We disagreed and held that "[t]he chancellor in the case sub judice properly decided the case as one for initial custody, and considered the factors delineated in *Albright v. Albright*, 437 So. 2d 1003 (Miss.1983)." *Id*. at (¶14).

¶46.    This case likewise involved the initial determination of TCW's custody even though the child was older than the child in *S.B*. In addition, there will always be a passage of time between a temporary and a final order, but in this case, that length of time was not so great as to give the temporary order the incidence of permanency. Accordingly, *Quadrini* did not apply, and the case was not one of a modification of a prior order but, rather, one of the initial determination of TCW's custody. The burden, therefore, fell equally on both parties to present evidence so the court could determine what custody arrangement was in TCW's best interest using the *Albright* factors. Because the chancery court used the wrong legal standard, we reverse its ruling concerning the application of *Quadrini.*

**II.     Whether the chancery court adequately addressed the *Albright* factors.**

¶47.    In its final judgment, the chancery court made no mention of the *Albright* factors and did not cite the *Albright* case. The court applied *Quadrini*, enforced the parties' private custody agreement, and found it was in the best interest of TCW that his custody be awarded

23

to Whitt. The court did make several factual findings that *relate to* the factors listed in *Albright*, but the court made no analysis of the evidence presented in light of *Albright*. The court mentioned *Albright* during the hearing on Hendrix's motion for reconsideration of the final judgment. In that argument, Hendrix's attorney said:

> And, Judge, that's really the basis of me filing[,] the basis for reconsideration, just asking the Court to go back and look at all of the *Albright* factors and lay them out for final judgment.

The chancellor responded:

> [A]nd I will go back through *Albright*. I should do that. But as I think about this, I remember so vividly how incredibly involved the father was in the child's life with his parents helping to take care of the child and other things.
> And as I read the judgment this morning, I thought to myself, well -- and I read your summations which were very good. You make some very good points.

Whitt's attorney argued that the final judgment actually contains an *Albright* analysis for all intents and purposes, though the court did not label each relevant factor as an *Albright* factor. Ultimately, in its written order, the chancery court denied Hendrix's motion for reconsideration without commenting on *Albright*.

¶48.   We have held that "[t]he chancellor must address each *Albright* factor that is applicable to the case." *Harden v. Scarborough*, 240 So. 3d 1246, 1251-52 (¶11) (Miss. Ct. App. 2018). However, the chancellor does not have to determine which factor favors which party, and *Albright* does not require that custody be awarded to the parent with the highest score. *Id.* "The point of *Albright* is to identify the custody arrangement that would be in the child's best interest—not to determine what is in either parent's best interest or which parent is the better person." *Id.*

24

¶49. We encourage chancery courts to identify each *Albright* factor, review the evidence presented, and determine in whose favor that factor weighed. *See Stuckey v. Stuckey*, 341 So. 3d 1030, 1038-39 (¶24) (Miss. Ct. App. 2022) (finding six of the twelve *Albright* favored the father and the other factors neutral); *Case v. Case*, 339 So. 3d 796, 804-10 (¶¶18-51) (Miss. Ct. App. 2022) (making findings on each factor, which were reviewed on appeal). Such an analysis enables us to review the chancellor's decision and determine if the evidence in the record supported his findings on the factors. However, there have been cases where both we and the Mississippi Supreme Court have upheld a chancery court order concerning custody when the chancery court has not enumerated the *Albright* factors but nonetheless weighed the evidence and determined custody.

¶50. In *Sobieske v. Preslar*, 755 So. 2d 410, 411 (¶1) (Miss. 2000), under a separation agreement incorporated into their irreconcilable-differences divorce decree, the parties had originally shared joint physical and legal custody of their four-year-old daughter. The year after the divorce, the wife remarried, and her new husband was transferred out of state. *Id.* Both parties filed motions to modify the custody order. *Id.* After hearing testimony on the motions, the chancellor awarded custody to the father. *Id.* at (¶2). The chancellor did not make any specific findings in his ruling as to the *Albright* factors and merely wrote:

> Considering the factors set forth in *Albright*, it appears that both parents have the desire and capacity to have the primary custody of Carley, however, Carley has close ties to the home she has lived in since birth as well as to her friends and family in Alcorn County, Mississippi. Carley has close ties to Mrs. Sobieske's twin sister, Mary Allred, and to Ms. Allred's daughter, Meagan, who is approximately the same age as Carley. Carley also has, in Alcorn County, other family and friends who she is close to. Mrs. Sobieske and her new husband are living in Atlanta, Georgia, and since Carley does not have

25

any other family in that area, there are uncertainties for her there.

*Id*. at 411-12 (¶4).  On appeal, the supreme court commented on the lack of findings on each *Albright* factor, stating:

> While it certainly would have been preferable for the Chancellor to have expressly considered each *Albright* factor, it is perhaps understandable that he did not do so in the present case, given that the testimony established that both Ricky and Margaret were fit and loving parents. The Chancellor's ruling appears to recognize that both parents are fit under *Albright,* and the Chancellor based his ruling primarily on which geographical location he felt would be most suitable for Carley.

*Id*.  The supreme court stated it was also mindful of its deferential standard when reviewing a chancellor's decision because the trial court views and evaluates the witnesses.  *Id*. at 413 (¶11).  The supreme court, noting that the chancellor "clearly agonized over his decision," held that "the central fact of the present case seems to be beyond dispute: both Margaret and Ricky love and care for their daughter, and there is no basis in the record for concluding that either party is an unfit parent."  *Id*.  Although the supreme court might have more confidence in the chancellor's ruling had he expressly considered the *Albright* factors, the supreme court explained it could not hold that the chancery court had abused its discretion.  *Id*. at (¶12).

¶51.    This Court cited *Sobieske* in our decision in *Mitchell v. Mitchell*, 820 So. 2d 714, 722 (¶47) (Miss. Ct. App. 2000).  There, the chancellor did not recite each *Albright* factor but he did say that he had re-read *Albright*.  *Id*. at 722 (¶47).  We found no error in the chancellor's failure to enumerate the factors because the record reflected that the chancery court considered them.  *Id*.  We stated that in *Sobieske*, "the majority of the Mississippi Supreme Court held that while they would have preferred to have had the *Albright* factors expressly

26

enumerated[,] . . . when considering the deference that must be shown to a chancellor, it could be inferred by the chancellor's mention of *Albright* that he had considered those factors." *Id.*

¶52.   In *Huseth v. Huseth*, 135 So. 3d 846, 858 (¶36) (Miss. 2014), the supreme court affirmed a chancery court judgment awarding custody even though the chancery court failed to analyze the *Albright* factors, citing *Sobieske*.   In that case, the husband withdrew his irreconcilable-differences-divorce complaint and filed a complaint for custody of the couple's son.   *Id*. at 849 (¶4).   The wife counterclaimed for separate maintenance and custody.   *Id*.   After hearing the matter, among other things, the chancery court awarded custody to the wife.   *Id*. at 850 (¶7).   The supreme court noted that although "the chancellor did not conduct a detailed analysis of the *Albright* factors on the record[,] . . . she did state that she had weighed the factors."   *Id*. at 858 (¶36).   The record contained "significant evidence" relevant to the *Albright* factors and the chancellor stated:

> Based upon the *Albright* factors, and I can enumerate them, but in the [interest] of time, let me just say that I have weighed the *Albright* factors and also the actions of Mr. Huseth in leaving the family and find that the mother is awarded the primary care and custody of the minor child of the parties.

*Id*. The supreme court noted that "each parent testified that the other was a good and loving parent, as in *Sobieske*." *Id*. at (¶37).   Specifically, the supreme court held:

> In light of the amount of evidence adduced at trial that was relevant to the *Albright* factors, the fact that each parent was shown to be a good parent, and the chancellor's indication that she had considered the factors by noting the stability achieved by the child's staying with his mother, we find that *Sobieske* is controlling, and consequently, we affirm the chancellor's custody determination.

*Id*. at 859 (¶39)

¶53.   However, more recently, in *Robles v. Gonzalez*, 246 So. 3d 945, 946 (¶2) (Miss. Ct.

App. 2018), we reversed a chancery court's final judgment in a divorce case in which the

court granted joint custody to the parties despite the ruling's similarity to the chancery court

ruling in *Sobieske*.  In *Robles*, after the parties rested, the chancery court ruled as follows:

> The court finds that there were two minor sons born to this marriage: J.P., who is presently ten; and J., who is presently six. The court when making—making a ruling regarding custody of minor children has been directed by the Supreme Court of Mississippi to consider the factors outlined in the *Albright v. Albright* case.  In order to reach that determination, the polestar consideration of this court, being what is in the best interest of the minor children of the parties—not necessarily what is in the best interest of the parents pursuing custody, but what the court determines is in the best interest of these two minor children.

> The court has considered all of the evidence and testimony in light of the enumerated *Albright* factors and finds that these two parents are comparatively equal regarding those factors—or put another way, that neither party is favored over the other party in employing the *Albright* balancing test—and, therefore, the court will and does hereby order joint legal and physical custody to be exercised by both of these parents with regard to the two children that are the subjects of this lawsuit.

> The chancellor then set forth a custody schedule that was intended to obviate the need for either party to pay child support.

*Id*. at 950-51 (¶22).  We noted that the chancellor did state he considered and balanced the

*Albright* factors.  *Id*. at 952 (¶27).  Nonetheless, we held:

> However, the chancellor's ruling reflects only his determination that Robles and Gonzalez "are comparatively equal regarding those factors—or put another way, that neither party is favored over the other party in employing the *Albright* balancing test."  Unlike *Sobieske*, the chancellor made no additional finding that both parties were loving and fit, and the record does not reflect on its face that both parents are loving and fit so as to support an award of joint custody.  Therefore, we must remand this case to the chancellor to provide

28

findings in accordance with *Albright* to support his custody determination.

*Id*.

¶54. In the case at hand, the chancery court's final judgment failed to make any mention of *Albright* or the *Albright* factors. After reciting the child's birthdate, the fact that the parties had lived together for a time, and the fact that they had entered into a temporary agreement, the final judgment commented on the *Quadrini* case, and further stated:

> At the time of [Hendrix and Whitt's] Temporary Agreement for [TCW], the minor child was 4-years-old and had been primarily with [Whitt]. The parties' Temporary Agreement for [TCW] merely document the past custody of the minor child with [Whitt]. The child is now 6 years-old, enrolled in school and has a schedule that should not be disrupted by litigation. Both parents can care for the child, and since birth [Whitt] and his parents have been the primary caregivers for the child.

> Although no court order existed prior to this action, the Court finds it is in the best interest of the minor child that the written agreement of the parties referred to herein be followed, since the parties have followed it thus far. [Whitt] has had primary custody of the child since birth and has taken care of the child with his parents. The actions of the parties regarding custody of the minor child are as if a temporary court order would have existed. Therefore, the court finds the Temporary Agreement of the parties should become a permanent one.

The order proceeded to give Hendrix visitation and required her to pay support.

¶55. In her motion for reconsideration, Hendrix specifically asked the court to review the *Albright* factors and revisit its holding in light of them. Although at the hearing on Hendrix's motion, the chancellor said that he would re-read *Albright*, the court's order denying the motion to reconsider fails to indicate that he did so. In addition, in the final judgment, the chancery court made no finding that both parties were loving and fit, though the record does reflect that the chancery court commented during oral arguments that he found them to be

29

"good people." The court's final judgment awarding custody to Whitt is clearly based on an erroneous finding that the temporary order should be made permanent, rather than on a determination of the best interests of the child using the *Albright* factors. Despite the examination of the record and extensive argument that Whitt's counsel makes of how each *Albright* factor was proved, it is the chancery court's findings, not a party's argument, that we review. In this case, the chancery court's final judgment simply does not reveal enough to indicate that the court's custody determination was based on the court's evaluation of the child's best interest according to the *Albright* factors. Accordingly, we reverse and remand the case to the chancery court to provide findings in accordance with *Albright* to support its custody determination.

**Conclusion**

¶56.    Because neither the temporary order nor the parties' temporary agreement expressed indicia of permanency, the chancery court erred by applying *Quadrini* and imposing a modification-of-custody burden of proof on Hendrix. In addition, because the chancery court failed to determine custody of TCW based on the *Albright* factors, we reverse and remand the matter for the chancery court to provide findings in accordance with *Albright* to support its custody determination.

¶57.    **REVERSED AND REMANDED.**

        **BARNES, C.J., GREENLEE, WESTBROOKS AND SMITH, JJ., CONCUR. WILSON, P.J., AND McCARTY, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., AND EMFINGER, J., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., NOT PARTICIPATING.**